## LANGWORTHY *v.* MYERS *et al.*

There may be possession *in fact*, of unimproved and uninclosed land.

One who enters on land, intending to take possession of the entire tract, no part of which is held adversely at the time of the entry, is in possession to the extent of his claim.

An entry upon land, with the intention of clearing and fitting it for cultivation, is such an entry as that the jury may be authorized to infer actual possession from it.

Where in action of forcible entry and detainer, the plaintiff, for the purpose of establishing actual possession of the premises, proved that in the spring of 1854, he had the premises, which were uninclosed, surveyed, and a map made; that at the same time, stakes were set at the corners, and the trees blazed on the boundary lines; that a portion of the ground was also subdivided and laid off into smaller lots; that stakes were set up at the corners of respective lots, rendering the boundaries visible, in the usual way of laying out town lots; that a street was also made through the adjoining land of the plaintiff, which was graded so as to extend some five or seven feet on the premises in dispute; that the trees and under brush growing on the premises where the street was opened, were cut off and hauled away by the plaintiff; that the plaintiff claimed to own some of the adjoining lots; and that he had sold lots adjoining the premises in dispute, to different persons; and where the court instructed the jury, that *actual possession* of real estate may be shown by any act of possession, as where the owner goes upon the land to take possession, or to exercise any other act of ownership; and if they believed that the plaintiff exercised over the premises those acts of ownership usually exercised by owners over land on which they do not actually reside, they might infer *actual* possession; and that it was not necessary to such *actual* possession, that the premises should be surrounded by a fence, or built upon; and where the jury found that the plaintiff was in the *actual* possession of the premises, which verdict the court refused to set aside on motion; *Held*, That the instruction was correct, and that there was sufficient evidence to justify the jury in finding that the plaintiff had actual possession of the premises at the time of the entry by the defendants.

Where certain instructions in writing were asked by the defendants, and the court, when the jury was about to retire, handed them to the jury without reading, with the information that they were given as asked, all of which was done without objection; and where the defendant moved to set aside the verdict, for the reason among others, that the court did not give the defendant's instructions, nor read them to the jury, which motion was overruled: *Held*, That the objection to the manner of giving the instructions, was too late after verdict, and that in the absence of objection, it must be presumed to have been done by consent.

Either party is entitled to have the instructions read to the jury before they retire, and such is the better practice; but if neither party require it to be done,

and suffer them to be handed to the jury, supposing that they would be read by the jury, it is too late after the verdict is rendered, to assign the same for error, or make the failure to read the instructions to the jury, the ground of a motion to set aside the verdict, and grant a new trial.

The conduct and behavior of the jury before they retire to consider of their verdict, being in the presence of the court, is presumed to be under its control, and subject to its reprehension or punishment, if in violation of good order, or wanting in due respect to the court, or its counsel.

To justify the court in setting aside a verdict, on the ground of the misbehavior of the jury, whether before or after the cause is submitted to them, the alleged misconduct should clearly satisfy the mind of the court, that a fair and impartial trial has not been had, and that the verdict is contrary to the law and the evidence.

Where in an action of forcible entry and detainer, the court instructed the jury as follows: " 1. That if the jury believe that there were indications upon the ground in dispute, at the time defendants took possession, of its being controlled and actually possessed by some other person, it was sufficient to put defendants upon inquiry, and they had no right to take possession of the land while it seemed to be in the possession of another person. 3. If the jury believe that defendants took possession secretly, and in such way as to avoid observation, they are authorized to believe that defendants meant to acquire an undue advantage, by which they ought not to be benefited. 8. That if the jury believe that defendants procured a surveyor to run out said lots, under an injunction of secrecy; that they on the same day followed close on the heels of the surveyor, with loads of boards and posts; that they commenced the construction of a hasty unsubstantial fence, on the side most out of view from the city; that they built and finished such fence in the utmost haste; that they put up in the same manner, a shanty of boards upon the lot, out of sight among the trees; that these improvements were made with the utmost secrecy and expedition, the jury are authorized hence to infer that the entry of defendants upon said premises, was by fraud and stealth." *Held*, That the instructions were legal and proper.

## *Appeal from the Dubuque District Court.*

THIS was an action of forcible entry and detainer, brought by Langworthy, to recover of defendants the possession of a lot in the city of Dubuque, designated on the plat of the city, as the " grave-yard lot." The action was first tried before a justice of the peace, and resulted in being appealed to the District Court. Numerous instructions were given by the court, as asked by each party, and a verdict was again returned in favor of plaintiff, which defendants moved the court to set aside, for various reasons, which are noticed in their order, in the opinion of the court. The court refused

to set aside the verdict and grant a new trial, and judgment was rendered for the plaintiff, from which defendants have appealed to this court, assigning for error, that the court erred in ruling that there was sufficient evidence of possession, to sustain the verdict, and in overruling the motion for a new trial.

The evidence relied upon to sustain the verdict, as well as the reasons urged for a new trial, so far as they are deemed important and essential, are given in the opinion of the court.

*Smith, McKinlay & Poor*, and *Nightengale & Wilson*, for the appellants.

*Wiltse & Blatchley*, and *Burt & Barker*, for the appellee.

STOCKTON, J.—The first question to be considered is, whether the court should have granted the motion of defendants, to set aside the verdict and order a new trial.

The first and second reasons urged are, that there was no evidence tending to show that Langworthy, the plaintiff, was in the actual possession of the premises at the time of the alleged entry by defendants, and that the verdict was contrary to the evidence and the instructions of the court. The evidence set forth in the bill of exceptions, shows that Langworthy, in the spring of the year 1854, had the premises surveyed and a map made, and at the same time stakes were set at the corners and the trees blazed, on the boundary lines; a portion of the ground was also subdivided and laid off into smaller lots; and stakes were set up at the corners of respective lots, rendering the boundaries visible, in the usual way of laying out town lots. A street was also made through the adjoining land of the plaintiff, which was graded so as to extend some five or seven feet on to the premises in dispute. The trees and under brush growing on the premises when the street was opened, were cut and hauled away by the plaintiff. It also appeared that plaintiff claimed to own some of the adjoining lots, and that he had sold lots adjoining the premises in dispute, to different persons.

We do not understand that the defendants have excepted to the instructions given by the court to the jury.   And the question is, whether this evidence under the instructions, was sufficient to authorize the verdict of the jury.   In other words, was it such as to authorize them in finding that the plaintiff was in the actual possession of the premises?   It is admitted, that up to the time of the grievances charged to have been committed by defendants, the premises were not inclosed, and no house was built upon them.   But the jury were not bound from that fact to infer, that plaintiff could not have been in the actual possession of the lot.   There may be possession in fact, of unimproved and uninclosed land. *Wall* v. *Nelson*, 3 Littell, 398.   The doctrine is well settled, that one who enters on land, intending to take possession of the entire tract, no part of which is held adversely·at the time of entry, is in possession to the extent of his claim. · *Robert* v. *Long*, 12 Ben Monroe, 195 ; *Campbell* v. *Thomas*, 9 id. 83.   An entry upon land, with the intention of clearing and fitting it for cultivation, is such an entry, as that the jury may be authorized to infer actual possession from it. *Humphrey* v. *Jones*, 3 Monroe, 261.   The rulings of the court, coincide with our own views of the law upon the question of what is sufficient to constitute *actual* possession.   And as we think there is sufficient evidence, to justify the jury in finding that Langworthy had actual possession at the time of the entry by the defendants, we think the court did not err in refusing to set aside the verdict.   *Bell* v. *Longworth*, 6 Ind. 274.

Nor do we think, that the verdict is against the instructions of the court.   The jury, we think, were properly told by the court, that the *actual* possession of real estate may be shown by any act of possession, as where the owner goes upon the land to take possession, or to exercise any other act of ownership ; and if they believed that the plaintiff exercised over the premises, those acts of ownership usually exercised by owners over land, on which they do not actually reside, they might infer *actual* possession ; and that it was not necessary to such *actual* possession, that the premi-

Langworthy. v. Myers et al.

ses should be surrounded by a fence, or built upon. *Bell* v. *Longworth*, 6 Indiana, 274. The premises, it is shown, lie adjoining other lands claimed by plaintiff. He had procured the same to be surveyed, the boundaries marked, and stakes to be set up at the corners. He had subdivided the same into smaller lots, and staked them off in the usual manner of laying off town lots, so that the corners and boundaries were visible, and had been offering them for sale. These were all acts from which the jury were told that they were authorized to infer the possession of the land by the plaintiff; and having found that they amounted to actual possession, we think the court did not err in refusing to set aside the verdict.

The third and fourth reasons assigned why the court should have granted a new trial, are, that the court did not give the jury the instructions asked by defendants; and did not read the same to the jury. It appears, that the instructions, twenty in number, were in writing, and as the jury were about to retire, the written instructions asked by defendants, were handed to them, and they were informed that they were given as asked. This was done without objection by either party, and in the absence of such objections, it will be presumed to have been done by consent. Either party is, without doubt, entitled to have the instructions read to the jury before they retire; and such is, no doubt, the better practice. But if the defendants, as in the present cause, did not insist upon the instructions being read by the court, and suffered them to be handed to the jury, supposing that they would be read by them, it is too late, after the verdict is rendered, to assign the same for error, or make the failure to read the instructions to the jury, the ground of motion to set aside the verdict, and grant a new trial. The court, undoubtedly, might well presume that the defendants consented to the course adopted, and waived the reading of the instructions to the jury.

The fifth and seventh reasons urged why the verdict should be set aside, are for alleged improper conduct on the part of the jury. It is charged that some of the jurors paid

Langworthy v. Myers et al.

no attention whatever to the law or evidence, and were read‑
ing newspapers during the progress of the trial, and while
defendants' counsel were making their speeches.   It is fur‑
ther alleged and shown by the affidavit of one of the jurors,
that after retiring to consider of their verdict, the jury did
not have the instructions read, which were asked for by de‑
fendants, and marked "given" by the court; that a juror
asked to have them read aloud, to which request others an‑
swered, that it was not necessary to read them, and that the
charge of the judge was enough; that the verdict was
formed without the instructions being read aloud, and with‑
out all the jurors reading them for themselves; and that only
a few of the jurors read the instructions.

While we would not wish to be understood as in the slight‑
est degree approving or countenancing the alleged miscon‑
duct of the jury, we do not see that such alleged misconduct
is inconsistent with their having found a verdict in accord‑
ance with the facts and the law.   The conduct and behavior
of the jury, before they retire to consider of their verdict,
being in the presence of the court, is presumed to be under
its control, and subject to its reprehension or punishment, if
in violation of good order, or wanting in due respect to the
court or its counsel.   But the court should be clearly satisfied
that by such misbehavior of the jury, whether before or after
the cause is submitted to them, a fair and impartial trial has
not been had, and that the verdict is contrary to the law and
the evidence.   The District Court refused, in the present in‑
stance, to set aside the verdict, for the reasons and upon the
facts presented.   We are not disposed to disturb its decision.
We have expressed an approval of the verdict, upon the law
and the testimony; and although instructions were given
which may not have been read by all the jurors, we do
not perceive that those they failed to read, were in any essen‑
tial point in contradiction of the written charge of the court,
or the instructions asked by plaintiff; or that the conclu‑
sions of the jury ought to have been changed, had the in‑
structions received from them a more careful and attentive
consideration.

The last reason urged by defendants, why the verdict should be set aside, was that the court erred in giving the first, third, sixth, seventh and eighth instructions, asked by plaintiff. These instructions were as follows:

1. That if the jury believe that there were indications upon the ground in dispute, at the time defendants took possession, of its being controlled and actually possessed by some other person, it was sufficient to put defendants upon inquiry, and they had no right to take possession of the land, while it seemed to be in the possession of another person.

3. If the jury believe, that defendants took possession secretly, and in such way as to avoid observation, they are authorized to believe that defendants meant to acquire an undue advantage, by which they ought not to be benefited.

6. That if the jury believe that Langworthy exercised, with reference to said premises, those acts of ownership usually exercised by the owners of land, over lots upon which they do not actually reside, they may infer actual possession.

7. That it is not necessary to the existence of actual possession of a lot, that it should be surrounded by a fence, or that it should be built upon.

8. That if the jury believe that defendants procured a surveyor to run out said lot, under an injunction of secresy; that they on the same day followed close upon the heels of the surveyor, with loads of boards and posts; that they commenced the construction of a hasty unsubstantial fence, on the side most out of view from the city; that they built and finished such fence in the utmost haste; that they put up in the same manner, a shanty of boards upon the lot, out of sight among the trees; and that these improvements were made with the utmost secresy and expedition; the jury are authorized hence to infer, that the entry of defendants upon said premises was by fraud and stealth.

We have before indicated our approval of the interpretation of the law, as given by the court in the sixth and seventh instructions. See Swan's Treatise, 465; Cowen's Treatise, 414; 14 Wendell, 239.

The other instructions, we do not think, were in any respect improper, and even if erroneous, they could not have misled the jury to the prejudice of the defendants' rights. But, as legal propositions, we think they are true; and that if defendants had reason to believe the premises were in possession of any other person, they had no right to take possession of the same themselves; that they ought not to be benefited by any undue advantage taken by them; and that the jury may be authorized from the facts set out in the eighth instruction, to infer that the entry of defendants upon the premises, was by fraud and stealth.    Judgment affirmed.

This cause was heard and decided at the June term, 1856, at which time a petition for a rehearing was filed by the appellant, and continued for argument.    At the December term, 1856, the following arguments were made, and opinion filed.

*Smith, McKinlay & Poor*, and *Nightengale & Wilson*, for the appellants.

There are several points which arise in the case.    The first and most important one is, what is the meaning of the words *actual possession*, as used in the chapter of the Code, relating to forcible entry and detainer?    *Possession* is a word derived from the civil law.    *Seizin* is the word which more appropriately belongs to the common law.    The words being nearly identical in meaning, they have occasionally been used the one for the other, and confusion has arisen in their use and meaning.    Even the writers of the civil law have disputed much over the law of possession.    We find the following laid down in Kaufmann's Mackeldey, which is a work of great merit.    He is speaking of *judicial possession :*

" The acquisition of judicial possession always requires: 1. Apprehension of the thing; that is some physical or corporeal act, (*corpus*,) by means of which, he who intends to acquire, brings himself into such a relation to the thing, that he may subject it to his exclusive control. 2. This apprehension must be accompanied by a certain intention (*animus*)

to consider the thing as his own.   Wherever both exist, pos-session is acquired; one without the other, will not suf-fice."

" The judicial possession of land (*fundus*) which has be-fore been in the possession of another, cannot be acquired by the mere fact of apprehension ; for besides this, it is requisite that the last possessor should have received notice of such apprehension, and either yielded willingly or had been ex-pelled forcibly by the other.

" We have seen, (pp. 239, 241,) that the acquisition of pos-session requires two acts, viz : a corporeal and a mental one. The continuance of possession, however, does not necessarily suppose a continued corporeal relation to the thing, but may be maintained by a continued *animus possidendi*, alone.   As to the *loss* of possession, it is true, this must be effected by a *contrarium actum* with respect both to the *corpus* and *ani-mus*, that is, by an abandonment or deprivation of the de-tention, and an abandonment of the will to possess.

" As regards the corporeal relation to the thing, the con-tinuance of possession does not depend on that immediate physical dominion over the thing, which is necessary to its acquisition, but it is sufficient if the possibility exists of re-producing such dominion at pleasure at any time.   Hence a man does not lose the possession of a thing which he has once acquired, by a mere separation from it; and conse-quently he can exercise detention also, through the medium of another.   Possession is not terminated, until by means of some fact or other, it has been made *impossible* for the pos-sessor to exert a physical dominion over the thing.

" As regards the *animus*, it is not necessary that the pos-sessor should be conscious of it at every moment; for the possession is not lost *by will* (*animus*) until the possessor comes to the contrary determination, and positively gives up the *animus possidendi* ; (*si in contrarium actum est*)."

That is the kind of possession that is sometimes called ac-tual possession in our books, but it is not really actual pos-session, as we will show in another place.   But it is a poor rule that will not work both ways.   Langworthy claims to

be in possession in October, 1854, because of acts done in June, 1854, and previous to June in that year. The defendants, however, (or rather the principal defendants,) occupied the premises from the fore part of the year 1836, and for several years subsequent thereto, as mineral grounds; they made the old diggings which appeared upon the premises; they spent about five thousand dollars in digging and improving the premises, in the way that miners ordinarily do. Where was the evidence that defendants had given up the *animus possidendi* ? Their continuance of possession did not depend on their immediate physical dominion over the land; it was sufficient if the possibility existed of *reproducing* their dominion at pleasure at any time. The facts in this case, show that the possibility did exist, and that there was no breach of the peace in the production of dominion. Langworthy does not even charge that against them. Langworthy's acts in surveying, &c.,—that is to say, his *apprehension*—did not give him possession, because the defendants, the last possessors, received no notice of his apprehension; nor did they yield willingly ; nor were they expelled by force.

The words " *actual possession*," have two separate and distinct meanings, which should not be confounded ; yet some courts have confounded them, but we trust this court will not follow such examples. " Actual possession," is used as opposed to " constructive possession," such possession as the law construes to be in a man when there is no real possession. In this sense of the words *actual possession,* the possession of my *tenant,* agent or steward, is *my* "actual possession,"—that is to say, *the* possession is actual and not constructive. The possession of lands adjoining a tract in dispute, may by law be *construed* to extend over that in dispute, but in such case, the possession is *constructive,* not actual. In order to authorize its being called actual possession of the whole, it would have to be shown that they were not two tracts, but a whole tract, and had been so treated from the time of taking possession of any part, then such possession, *when continued,* might reasonably be called actual possession of all.

*Actual possession* is often used for actual seizin, as distinguished from *constructive seizin.* A man who had acquired title to land was construed to have seizin of it; but it required *actual seizin ;* there must have been a livery of seizin to him, in order that his widow should be entitled to obtain dower. In all these cases, *actual* is used as opposed to *constructive.*

But *actual possession* has another meaning. It means a possession continued from day to day ; such a possession as when it is interfered with, needs a summary remedy ; one where the person injured needs immediate reparation. It is because of the need of this summary remedy, that a case may be tried on two days' notice only. (Code, § 2368.) My tenant may maintain an action against me for a forcible entry on my own land, because though in one sense, his possession is my possession, yet it is *he* that has the actual possession from day to day, and has right to be speedily restored thereto, if I interrupt him in it, either by forcibly turning him out, or by watching till he goes to market to buy his victuals, and then slipping into the premises. This is the sense in which *actual possession* is used in the Code. Such a possession as needs a summary remedy for an interference with it, is a continuous—day to day—possession, one in which an ordinary action of trespass would not afford a sufficient remedy.

The Code says, "*prior actual possession of another.*" Had Langworthy such a prior actual possession, as required the summary remedy to be administered by a justice of the peace ? Certainly not; his last act of possession was in June. The defendants went in October, to survey their lot, and build their fence and cabin. That is, Langworthy had been able to do without actual possession for nearly four months ; he could have done without it a little while longer, and taken his remedy in the ordinary course, without resort to a summary proceeding before a justice.

It appears from the evidence—all contained in the bill of exceptions—that the defendants had spent about five thousand dollars in mining, upon the premises, between the years

Langworthy v. Myers et al.

1839 and 1844, and that the ground was otherwise unimproved and unoccupied, until the spring of 1854, when Langworthy caused it to be surveyed into town lots, and staked out in the usual way. He graded a street up the hill to this lot, and five to seven feet on to it, and cut out the small timber the width of the street through the lot. He caused two loads of poles to be hauled to his house a mile and a half distant, and another load was stolen by some person unknown. This was the latter part of May or first part of June. On the 4th of October following, the defendants inclosed the place with a post and board fence, and built a cabin. There was no person there at the time; the ground was vacant and unimproved except as aforesaid. About three days after they went there to build the fence, Langworthy and his son came up the street, and were about to let down the bars and go into the inclosure, when defendants came out of the brush, and informed them that they were there for Myers, and that they would defend it at the cost of their lives. Langworthy went inside the inclosure, set up a couple of posts, went away and came back and found them pulled up; then demanded possession, and brought this action.

The defendants were as much in the possession of the place as Langworthy; they at one time expended large sums of money in mining upon the lot, and their mining shafts were still there. Langworthy's acts were not such as they would be likely to see, unless they had been actually on the premises from time to time; the making of a road through adjacent land, and the setting of stakes, and blazing of trees, are not such acts as would call attention from viewing the premises at a distance, and Langworthy's acts could only give notice of an interference with the defendant's rights, by the defendants, or some of them, actually visiting the land.

Langworthy purchased the adjoining lands from the defendants; he had a right to put stakes along the boundaries of his purchase; he had a right to lay out streets through his purchase, and lay off lots on each side of the streets; but he had no right to go on defendants' land, and set stakes,

Langworthy v. Myers et al.

blaze trees, and cut brush, and his possession of his neighbor's land, cannot and should not extend beyond the time he is *actually* there.  It is only a real *actual* possession that is protected by the forcible entry and detainer act, and not a possession, construed to continue, because of certain acts done on another's land several months previous.  It is true, the court ruled out the title papers, and so there was nothing before the jury to show the extent of the plaintiff's rights; nothing to show but that his acts were trespasses on the lands of others.  The answer denies that plaintiff had actual possession of the lot or any part; denies that plaintiff was in possession of the land on the east or on the north; denies that the same was parcel of the same premises; denies that he remained in possession, &c.  There was no proof that they were parcel of the same premises, and, therefore, it is only the acts done on the lot itself, that could have anything to do with the case.  And we say the proof did not amount to proof of such actual possession as is intended to be protected by the summary remedy by forcible entry and detainer.

"Where the possession of land is relied upon for any legal purpose, in the absence of paper title, it should, in the language of the law, be a *pedis possessio ;* an actual occupancy of the premises in question."  *Mutual Fire Insurance Co.* v. *Marseilles Manufacturing Co.,* 1 Gil. 239 and 266.  Actual occupancy there evidently means *with the foot on the soil.*

A certificate of the United States land office, is no evidence of such a possession as will enable the party to sustain this action. *Rogan* v. *Walker,* 1 Wis. 650.  We request the court to examine this case, as to what is actual possession to maintain this action.  Also *Kincaid* v. *Logue,* 7 Missouri, 166; *Moore* v. *Sloane,* 7 Mo. 170.  In *Kincaid* v. *Logue,* the plaintiff had bought an improvement, built a cabin in which he lived, built the worm of a fence around the place, in some places three or four rails high, and in others one or two rails high, with the declared intent of making a pasture and keeping off intruders.  The defendant entered the inclosure and built a cabin near to that of Kincaid.  Held, that Kincaid

*had no such possession as would enable him to maintain forcible entry and detainer.*

In *McMechan* v. *Griffing*, 3 Pick. 149, the evidence of possession was the repairing of a fence, the driving cattle to pasture, taking down and removing an old hovel, which covered a saw for sawing wood, taking all his winter's wood from the lot, and principally from the part in dispute, selling five trees from the lot, three of them on the part in dispute, and which were cut and carried away. The part in dispute was Timothy Griffing's share in the division of his father's estate, and was part of what was called the Tracy lot, the other part of the lot being the share of another person, who bought Timothy's share from him, but did not record the deed, and who claimed to be in possession of the whole lot, and by such possession to protect his title against a subsequent purchaser from Timothy. On page 156, the court says: "There is no evidence to show that the tenant, at the time of the attachment, or at any time previous, had the open visible possession, and improvement of the premises."

*Blood* v. *Wood*, 1 Metcalf, 528. An execution was levied on land not the judgment debtor's, being part of a large uninclosed meadow; and the judgment creditor entered thereon two or three times for the purpose of showing the grass for sale, but took no actual possession. He afterwards advertised a sale of the grass in a public newspaper, as grass growing on his land, and caused the same to be sold at auction, at a distance from the land, and the purchaser thereof cut and carried it away, the true owner of the land having no actual notice of the proceeding. Held, that these acts did not constitute such a disseizin of the true owner as to prevent his maintaining an action of trespass against the purchaser of the grass. In *Barr* v. *Gratz's heirs*, 4 U. S. Cond. 426, 427 : " There being no evidence that Colburn was the legal owner of Benjamin Netherland's survey, it was held that his entry must be construed as an entry without title, and *consequently his disseizin must be limited to the bounds of his actual occupancy.*" In *Coburn* v. *Hollie*, 3 Metc. 125, it is decided, " that the making of a fence on wild land, by felling

trees and lapping them together, is not sufficient to warrant a jury in presuming that the owner of land had notice of such fence, nor does it amount to a disseizin of the owner." The court affirm the case of *Bates* v. *Norcross*, 14 Pick. 224, in which case, it is held, that "a deed of wild land, executed and acknowledged by a grantor, who had no right to the land, and duly recorded in the registry of deeds, and a mere entry by the grantee, without an *open exclusive* occupation manifested by fencing or otherwise, do not amount to a disseizin against the will of the true owner."

In 2 White & Tudor's Leading Cases, 119, in speaking of constructive notice of title arising from possession, the annotators say : "It is also well settled that the possession must be actual, and must be of such a nature as would suffice to constitute a disseizin or adverse possession. *Harrick* v. *Powell*, 9 Alabama, 409." And in *Holmes* v. *Stout*, 3 Green's Ch. 492, it was decided, that cutting timber, from time to time, in woodland at a distance from the dwelling of the party who cut it, was not such a possession as would give constructive notice of an unrecorded titile. If it was not such possession as to give notice, it certainly was not *actual possession.* See *Packwood* v. *Thorp*, 8 Missouri, 638; and Addison, (Pennsylvania,) 316. The latter is a strong case in point.

The case of *Bell* v. *Longworth*, 6 Indiana, 274, has been cited as an authority against us. But a careful examination of it, will show that it is not against our view of the case, but rather in support of it. Forcible entry and detainer, in Indiana, is as follows : "Every person who shall violently take or keep possession of any lands, with menaces, force, and arms, without authority of law, shall be deemed guilty of forcible entry or forcible detainer, as the case may be." 2 Revised Stat. of Indiana, 430, § 12. It will be noticed that *possession* is the word used in that statute, whereas, *prior actual possession* are the words used in ours; the words *prior actual* must mean something, otherwise the legislature of our state would not use them : and so the decisions of Indiana courts, would not be strictly in point here. Besides the case of *Bell* v. *Longworth*, shows that title papers were introduced,

Langworthy v. Myers et al.

which shows that the action is not the same in this and in that state. Longworth showed his title papers, which had reference to the entire quarter section in dispute, and it further appeared that in 1822, he "appointed an agent to take charge of his purchase, and has since continued the agency uninterrupted; that the agent has resided near or upon the land, which is situate adjoining Evansville, in that state; that, in the language of one of the witnesses, the whole quarter section was included in his agency; he cut timber over it, prevented others from cutting, warned people off of it, and employed other persons to watch trespassers and keep them off. He paid the taxes upon the quarter, *leased portions of it to different individuals,* by whom some clearing and fencing were done; but the whole tract was never inclosed; though the oldest inhabitants in the vicinity say, it had always been known amongst them as Longworth's quarter." And again, further down on the page, 275 : "As to the entry upon and detainer of the land by Bell and Kiger, [the defendants,] there was evidence tending to prove that they knew it belonged to, or was claimed by Longworth; that it was in charge of his agent, and *patches of it in possession of his tenants ;* and that with this knowledge, in January, 1852, *they entered upon a portion of the cultivated part of the section,* commenced fencing it," &c., &c.

We call the attention of the court here, to the fact that there was evidence of *cultivation* and possession by *residence,* in that case; such possession as we say is *actual possession,* and consequently that the case cannot be against us. On page 277, the court says : "A man cannot go, solitary and alone, to the prairies or forests of the west, set himself down in the middle thereof, and claim that he possesses all, to an undefined extent, not then actually possessed by some one else. He must be limited to that portion over which he exercises *palpable* and *continuous* acts of ownership, as being the quantity which he claims as his own—there being no other evidence, in such case, to enable us to determine the quantity." The court say, "*palpable and continuous* acts of own-

ership;" just such acts as we contend are meant by *actual possession*.

Another case is cited as being against us, namely, *Campbell* v. *Thomas*, 9 B. Monroe, 83. That is an action of ejectment. *Possession* is spoken of, and not actual possession. Besides, it will be seen that the party *entered and settled* on his survey, and his possession was held to extend to the boundaries of his survey.

Still another case is quoted, namely, *Roberts' heirs* v. *Long*, 12 Ben. Monroe, 195. This is an action of forcible entry and detainer; but a careful examination of the case, will show that it is in favor of defendants, in the present case, and not against them. (See page 197, to end of case.) The defendant was successful in the court below, and in the court above too, and because that the plaintiff's possession being under a junior patent, could not be held to extend to any more than what did not interfere with the older patent. The appellants (that is the plaintiffs) did not show any right to enter upon the part covered by the older patent; their " acts were *unauthorized and illegal*, and not constituting in themselves an actual possession, will not by operation of law have the effect of extending the actual possession of the appellants." And it should be further noticed that the plaintiffs were *actually settled* on their claim, but that their settlement was not held to extend to that part of it on which the alleged forcible entry was made.

Swan's Treatise, 465, and the 14th of Wend. 239, are the only other authorities cited against us, which we have had the opportunity of examining. We contend that they are not in point, because they refer to the action of trespass. The possession necessary to sustain trespass, is different from that necessary to sustain forcible entry and detainer. I may maintain trespass for an injury to land in the possession of my tenant, and declare on it as my possession. I cannot do so in forcible entry and detainer. The proceedings are not analogous; the words *prior actual possession* must mean something more than such a possession as is sufficient to maintain trespass; it must mean a possession from day to day, a con-

tinuous and palpable possession; such a one as when it is forcibly or stealthily interfered with, requires a summary remedy—a remedy to be exercised on two days' notice, without waiting for a calm and careful trial in the District Court, in the ordinary way.

*Wiltse & Blachley*, for the appellee.

We have examined the argument of defendants' counsel, upon the present hearing, and have turned to the authorities cited, without finding anything not adduced by them both in the District Court, and upon the first hearing in this court. The cases of *Kincaid* v. *Logue*, 7 Mo. 166; *Sloan* v. *Moore*, 7 Mo. 170; and *Packwood* v. *Thorp*, 8 Mo. 636, all turn upon the want of title in, and the fraud of, the respective plaintiffs. In these, as in many cases to be met with, whether from terms of the statute, or otherwise, the question of title has been the controlling one, and where a party has been found in possession, without colorable or *bona fide* title, and especially where the possession has been in fraud of such title, it has found no favor with or mercy from the court.

The case of *McMeehan* v. *Griffing*, 3 Pickering, 149, decides that certain acts of possession did not amount to notice of an unregistered deed. In *Coburn* v. *Hollis*, 3 Metcalf, 125, it was decided that a brush fence felled upon another's land, in the woods, some forty years before, and of which the owner of the land had no actual notice, did not amount to a disseizin that would enable the intruder to hold the land under the statute of limitations. The case in 14 Pickering, goes to the extent that a bare entry under a deed from a grantor who had no title, does not amount to disseizin. The case of *Hancock & Powell* v. *Thompson*, 9 Alabama, 409, discusses the kind of notice of an outstanding, equitable title, that will not defeat a legal title.

The "strong case," in Addison's (Pa.) Reports, (*The State* v. *Lemmon*, 315,) is the only one defendants have produced, the terms of which squint towards their definition of actual possession. But aside from the great change that has in sixty years taken place in the nature of the action of, and the

scope and policy of the law governing forcible entry and detainer, two facts conspire to strip this case of authority : 1st. It gives no clue to the law upon which it was based, and was manifestly pronounced without consideration ; and 2d. It was a criminal proceeding.

The disquisition in Leading Cases in Equity, by White and Tudor, will be precisely in point, when a *bona fide* purchaser for value, seeks the shield of equity against a defect in title, of which he has no notice.

That the " actual possession," of our Code, is as claimed by defendants, a being upon, and all the time upon, the land, is not helped any by the case of *Gates* v. *Winslow*, 1 Wis. 650. The case does not contain a word upon the subject. The 1st of Gilman, (*Illinois Mutual Fire Insurance Co.* v. *Marseilles Manufacturing Company*,) is cited °to prove that actual possession is a *pedis possessio*. The title papers of the company were defective, and it fell back upon its possessory title, in order to make out an insurable interest. The question was, whether the possession amounted to title ?

These are the authorities relied upon, to show that ·this court " overlooked " the meaning of actual possession.

The notion that the possession requisite to maintain this action, must be a continuous bodily occupancy, is wholly new, is advanced by no law writer, and would render the act concerning forcible entry and detainer a dead letter ; for against such an occupancy, it would be rare indeed, that a forcible entry would or could be made. A vacant room in a house, could, by the same reasoning, be entered and held, till the slow remedy of trespass or ejectment should come to the relief of the owner.

Actual possession, in regard to real property, is a term widely used in American law, and has the same meaning and application in trespass, that it has in forcible entry and detainer cases. If otherwise, it is passing strange, that the distinction has escaped the observation of courts and publicists. It means any act or fact, which puts the mere intruder, without title, upon inquiry ; and this rule has double orce, as applied to town or city property. There is no four

Langworthy v. Myers et al.

acre lot in any city of the size of Dubuque, of which the owner is not in actual possession; nor can there be found in such a city a man, so ill informed as not to know that the usual manner of actually possessing town lots, is by having the boundaries marked out.

The premises in this case, was a lot in the city of Dubuque. Plaintiff not only owned and had entered upon adjoining grounds, but had sold the contiguous grounds in connection with, and as part of said premises. Much more than this; he had entered upon the tract in dispute, cut firewood from it, cleared away the brush, surveyed the boundaries, and subdivided it into lots, set up monuments at the corners, blazed the trees upon the lines, graded a street to, and for several feet upon the premises, all which were plainly to be seen, and were seen by defendants. Their access in fact to the lot, was by plaintiff's road, and it was over this road that defendants stealthily and hurriedly hauled up the materials for their pine fence. The manner of defendants' entry, demonstrates the fact that they had full and complete notice, and that their entry was forcible, stealthy, and fraudulent. A gang of eight or nine men; their hurry; the part of their fence out of sight of the city, and in the brush, built first; their surveyor urged to speed, and enjoined to secrecy; and their gang of ruffians employed to defend this fraudulent possession with their lives! Upon the first appearance of the fence on the side of the lot in view of the town, the plaintiff asserts his possession, and in attempting to enter upon his land, is stopped by a gang stationed for this purpose. Who was this ambuscade to keep out, but the man who had left upon the ground abundant and unmistakable evidences of actual possession? Is any other finding by a jury than "guilty," conceivable, under this state of facts? especially when instructed in the law of the case as stated in 1 Cowen's Treatise, 414; 4 Conn. 79; 12 Johns. 452; 21 Conn. 500; 14 Wend. 239; 3 Monroe, 261; 3 Littell, 298 and 394; 6 Ind. 274; 12 Grattan, 470?

But defendants would have it that plaintiff was a trespasser upon this lot, because they had once mined there. The only

evidence that defendants ever had anything to do with this lot, prior to that entry for which this suit was brought, is the deposition of one Michael Riley, taken in support of the fishing bill, brought in 1854, by defendants against plaintiff, and which deposition, strangely enough, forms a part of the record in this case. By this deposition, it seems that the commissioners who laid out Dubuque, under the acts of Congress of 2d of July, 1836, and 3d of March, 1837, adjudicated upon defendants' claim to this lot, and decided against them. Said commissioners formed a court for this very purpose, from the decisions of which there was no appeal. Witness, in 1845, mined under a lease from the city of Dubuque, (see his cross-examination.) He says, that they did not know that the lot had not been given to them, till the map came out, five years after their testimony was given to the commissioners, and then says, that the commissioners sat in 1837 or 1838, and that the map came out just before the sale of the lots in 1838 or 1839.

Defendants, in their brief, admit that plaintiff entered under a deed from said city.

Upon this hearing, it is upon defendants to show that this court has erred, and no approach to such a showing do they make.

*Burt & Barker*, for the appellee, also filed a written argument, in which they cited the following authorities: *Olinger* v. *Shepperd*, 12 Grat. 470; *Cates* v. *Loftus' heirs*, 4 B. Monroe, 442; *Boyce* v. *Blake et al.*, 2 Dana, 127; *Roberts* v. *Long*, 12 B. Monroe, 195; 4 Kent Com. 124.

STOCKTON, J.—In answer to the petition for a rehearing in this case, and to the additional argument furnished by defendants' counsel, we deem it proper to state more fully and explicitly, our views of the law in actions of forcible entry and detainer, in its relation to this case, and particularly as to what is meant by the words "actual possession," in the statute.

It is claimed by defendants' counsel, that the words used

in the Code, (section 2362,) have two meanings: *First.* When it is applied to a possession distinct from constructive possession, where there is no actual occupancy; or to the possession which one may have by his agent, steward, or tenant; *Second.* Where it is applied to a party who has possession continued from day to day; in other words, actual bodily occupancy. It is claimed, that the summary remedy of forcible entry and detainer, is given only to the person who may have such actual possession as is last mentioned, where the forcible ejection demands a more speedy remedy than is furnished by the actions of ejectment or trespass—that it is only a real actual possession that is protected by the act, and not a possession construed to continue, because of certain acts done months before. We think the distinction attempted to be drawn is not a very clear one, and if it were justified by the authorities, we do not think the conclusion sought to be drawn from it, is legitimate. The remedy is given by the statute in one contingency only, viz: " where the defendant has by force, or intimidation, or fraud, or stealth, entered upon the prior actual possession of another, and detains the same." To construe this language as affording a remedy for those cases only, where the party is ousted from premises of which he is in the actual bodily possession from day to day, would be to restrain the plain meaning of language, in order to deny that speedy and effectual redress given by the statute of forcible entry and detainer, for a class of wrongs which quite as loudly call for such remedy as those which are claimed by defendants' counsel, as being specially favored and provided for by the statute.

The distinction claimed to exist, is illustrated by the possession which a man holds by his tenant, agent, or steward; this, it is said, is by the law construed to be his *actual* possession. Now the possession of lands by the tenant, agent, or steward, is the possession of the person, under or for whom he holds; and it never was denied that a man might acquire or hold the actual possession by another as well as by himself; for what a man does by another, he does by himself. *Speed* v. *Buford*, 3 Bibb, 75. We cannot better illus-

trate the whole subject, than by quoting and adopting as our own, the language of BOYLE, C. J., in the above entitled cause : "There are but two kinds of seizin or possession known to the law; a seizin or possession in fact, and a seizin or possession in law. The former is gained by an actual entry upon the land; the latter is where there is no such actual entry made, but the law for certain purposes, supposes a fictitious possession. The one is, therefore, founded upon fact, and the other upon fiction. The one is real and cognizable by the senses; the other is ideal, and exists only in contemplation and construction of law. Besides these, the law not only recognizes no other, but it is impossible that any other should exist. The mind cannot conceive the idea of a third species of possession; nor can any combination of words express such an idea. To say that a person may be seized in deed or in fact, by construction of law, is an assertion which conveys no distinct meaning; it is, in truth, inconsistent with itself. For if a person be seized in deed or in fact, then he is not seized by construction; and if he be seized by construction only, he is not seized in deed; where the fact exists, the fiction must be at an end; and if the fact do not exist, the possession can be nothing but a fiction." *Speed* v. *Buford*, 3 Bibb, 74.

The defendants can derive no advantage, nor do we think their rights at all strengthened in this action, from the fact that some of them had previously claimed or possessed the premises in dispute. The testimony showed that in the year 1836, and for some years subsequent thereto, they were occupied by them as mining ground. It is pretty clear, however, that their claim had been abandoned, and that for more than ten years before the commencement of this suit, and until the acts of Langworthy, no one had actual possession of the premises, and there was no improvement on them. It had been set apart by the commissioners who laid off the town of Dubuque under the act of Congress, as a grave yard for the use of the public, and was marked and designated as such on the official map of the town returned by them. They refused to grant a certificate of pre-emption to any of the

claimants of the premises. At the time of the acts of Langworthy, in the spring of 1854, no one appears to have been in possession. His acts were unquestioned, and for all the purposes of this cause, must be taken to have been done with lawful authority. We do not understand the defendants' counsel to contend, that the jury were not authorized to infer from them that Langworthy had actual possession, according to one of their definitions of the term.

They oppose to these acts, however, the previous possession of the defendants, or some of them, ten years before; from which they would have the court infer that the entry of Langworthy was unauthorized and tortious; and the further fact that Langworthy's last act of possession was shown to have been in June, and that the taking possession by defendants was in October. They claim that Langworthy's possession did not extend beyond the time he was actually on the land, and that defendants, at the time of their entry, finding no person actually on the premises, had good right to take possession.

The ready and conclusive reply to this is, that the jury were the judges, under the instructions of the court, of whether the plaintiff had the actual possession of the premises by the acts done in June, and whether such possession continued until October, the time of defendants' entry. It is the intention with which the acts are done, that gives them their character. If done with no intention of acquiring possession, they did not give the plaintiff possession. And by the same acts from which the jury inferred that Langworthy had, and obtained actual possession, they were authorized to infer that such actual possession continued to the time of the alleged unlawful and forcible entry by defendants. It is not claimed that there was any evidence of abandonment of the possession by plaintiff, or of any intention of such abandonment, unless it is to be inferred from the fact that the premises were not inclosed or built upon, and that plaintiff did not, from day to day, have the actual occupancy thereof, *with his foot upon the soil.*

In reference to that feature of their case, in which it is

claimed for defendants, that their rights to the premises in dispute are of long standing and originated many years prior to any claim plaintiff may have, we refer them to the language of the Court of Appeals of Virginia, in the case of *Olinger* v. *Shepperd*, 12 Grattan, 470, in which they say: " The remedy for a forcible entry was designed to protect the *actual possession*, whether rightful or wrongful, against unlawful invasion, and to afford a summary redress and restitution. The plaintiff is not suing for damages, but to have the possession restored to him. The judgment has only the effect of placing the parties in *statu quo*. It settles nothing between them in regard to the title or right of possession." And again, " what is the nature of the possession to which this summary proceeding applies? It is certainly not confined to possession by actual occupancy or inclosure. It applies to any possession which is sufficient to sustain an action of trespass. Title draws after it the possession of property, not in the adverse possession of another. Actual possession of a tract of land, under *bona fide* claim and color of title to the whole, is possession of the whole, or so much thereof as is not in the adverse possession of others. This is the general principle, and it applies to the remedy in question."

To the argument and authorities furnished to us by defendants' counsel, we have given that careful and deliberate consideration which the importance of the questions involved seemed to demand; but we have not been able to find in them anything subversive of these propositions: *First*. There may be possession in fact of unimproved or uninclosed land; and it is not essential to such actual possession, that the premises should be surrounded by a fence, or built upon. *Second*. An entry upon land with the intention of clearing it and fitting it for cultivation, or of exercising over it such acts of ownership as are usually exercised by owners over land on which they do not reside, is such an entry as that a jury may infer from it actual possession. *Third*. One who enters upon land, no part of which is held adversely at the time of the entry, intending to take possession of the whole tract, is in possession to the extent of his claim. In support of these

positions, in addition to the authorities already cited, we may refer to the following : *Cates* v. *Loftus' heirs,* 4 Monroe, 442 ; *Boyce* v. *Blake & Co.,* 2 Dana, 127 ; 4 Conn. 79 ; 21 Ib. 500 ; 12 Johnson, 452. We conclude, therefore, that there was no error in the ruling of the District Court, refusing a new trial, on the ground that there was no sufficient evidence of actual possession by the plaintiff, to authorize the jury in finding the verdict.

On the other branch of the question, involving the giving of certain instructions asked by the plaintiff. and the failure of the court to read to the jury the written instructions asked by defendants, and the conduct of the jury before and after retiring to consider of their verdict, we find no sufficient reasons to induce us to alter our opinion heretofore expressed. The instructions asked by plaintiff and given by the court, were not excepted to by defendant. No objection was made to the handing of the written instructions to the jury, without having them first read ; no effort was made to obtain the action of the court to correct the alleged improper conduct of the jury before their retirement ; nor is there anything from which it can be inferred that the jury, in making up their verdict, misunderstood or misinterpreted the charge of the court.

A large discretion is allowed the District Court in granting or refusing new trials. We would not interfere with this discretion, or reverse the action of the District Court, upon light grounds or trivial reasons. We must be clearly satisfied that the party's rights have been so prejudiced, and that such injustice has been done him by refusing him a new trial, as to call unmistakably for the interposition of this court. In the present case, the District Court was cognizant of the facts on which the application for a new trial was based. A portion of them occurred in its presence. As it has not seen proper to interfere with the verdict, neither upon the facts which were of its own knowledge, nor upon those brought to its notice by the affidavit of the juror, unless the error and injustice of its action are made palpably manifest to us, we will not reverse its judgment.

We can only judge of the weight which the District Court attaches to the reasons urged for a new trial, and of its opinion of their validity, by the decision which it renders upon them in this case. The record shows that the court was of opinion that there ought not to have been a new trial for the reasons urged. It cannot be expected that this court will turn aside from the record, and look elsewhere, to ascertain whether the court entertained a different opinion. It is hardly permissible in the party to file affidavits in this court, to show that the District Court thought one way, and decided another. We must abide by the record as it is. The judgment of affirmance will stand as originally entered.

Judgment affirmed.