JOSEPH BARCLAY, FLORENCE COLTER AND JOHN M. SNOWDEN,
PLAINTIFFS IN ERROR v. RICHARD W. HOWELL'S LESSEE.

Ejectment. The declaration described the property for which the suit was instituted as " lying between Water street and the river Monongahela, with the appurtenances, situate and being in the city of Pittsburgh." The jury found a general verdict for the plaintiff; and the defendants assigned for error, that the verdict, being general, is void for the want of certainty. By the court: This must be considered as an exception to the sufficiency of the declaration; as any other matter embraced in it might have been considered on a motion for a new trial, but cannot now be noticed.

Formerly it was necessary to describe the premises for which an action of ejectment was brought with great accuracy; but far less certainty is required in modern practice. All the authorities say that the general description is good. The lessor of the plaintiff, on a lease for a specific number of acres, may recover any quantity of less amount.

The plaintiffs in error, defendants in ejectment in the circuit court, claimed for the city of Pittsburgh, a slip of land lying on the bank of the river Monongahela near the junction of that river with the river Alleghany, being a space between the southern line of the lots of the city, and the Monongahela river. It was contended by them, that this slip of land was dedicated by the surveyor, when he laid out the town, to the public, as a street, or for other public uses. The depositions of witnesses who were present when the ground on which the city stands, was laid out in lots by the surveyor, authorised so to do by the proprietors of the land, were offered to prove declarations of the surveyor, made to persons assembled at the survey, and who occupied part of the ground so laid out; by which declarations, and other acts of the surveyor, also proposed to be proved, it was contended the said dedication was made; i. e. that he had observed that " the street," the slip of land, " to low water mark, should be for the use of the citizens, and the public, for ever." By the court: The surveyor had authority to fix upon the plan of the town and survey it. He had the power to determine the width of the respective streets and alleys, the size and form of the lots, to mark out the public grounds, and to determine on every thing so far as related to the town, and its beauty, convenience and value. These were clearly within the scope of his powers, as they were essentially connected with the plan of the town, on which he was authorized to determine at his discretion. The proof of such declarations should have been admitted by the circuit court; because, under the circumstances, they formed a part of the transaction.

The declarations of a surveyor which contradict his official return, are clearly not evidence: nor ought they to be received, where he has no power to exercise discretion, as explanatory of his return, while he is still living, and may be examined as a witness.

If the ground in controversy in the ejectment had been dedicated for a particular purpose, and the city authorities had appropriated it to an entirely different purpose, it might afford ground for the interference of a court of chancery to compel a specific execution of the trust, by restraining the corporation, or by

[Barclay and others v. Howell's Lessee.]

causing the removal of obstructions. But even in such a case, the property dedicated would not revert to the original owner. The use would still remain in the public, limited only by the conditions imposed in the grant.

The right of the court to decide on the legal effect of a written instrument, cannot be controverted; but the question of boundary is always a matter of fact for the determination of the jury.

It is the province of the court, in an action of ejectment, that they should fix the boundaries of the tract in controversy by an examination of the whole evidence.

Artificial or natural boundaries called for, control a call for course and distance.

An unmolested possession for thirty years would authorise the presumption of a grant. Under peculiar circumstances, a grant has been presumed from a possession less than the number of years required to bar the action of ejectment by the statute of limitations.

By the common law, the fee in the soil remains in the original owner, where a public road is made upon it, but the use of the road is in the public. The owner parts with this use only; for if the road should be vacated by the public, he resumes the exclusive possession of the ground; and while it is used as a high-way, he is entitled to the timber and grass which may grow upon the surface, and to all minerals which may be found below it. He may bring an action of trespass against any one who obstructs the road.

Where the proprietor of a town disposes of all his interest in it, he would seem to stand in a different relation to the right of soil, in regard to the streets and alleys of the town, from the individual owner over whose soil a public road is established, and who continues to hold the land on both sides of it. Whether the purchasers of town lots are in this respect the owners of the soil over which the streets and alleys are laid as appurtenant to adjoining lots, *Quære.*

In some cases a dedication of property to public use; as for instance a street or public road, where the public has enjoyed the unmolested use of it for six or seven years; has been deemed sufficient for dedication.

ERROR to the circuit court of the United States, for the eastern district of Pennsylvania.

This was an ejectment originally instituted in the district court for the western district of Pennsylvania, and removed to the circuit court for the eastern district, under the act of congress of March 3, 1821; the judge of the western district having been counsel in a former ejectment, involving the same matter in controversy.

The defendant in error, the plaintiff below, claimed in the declaration, "one messuage, a lot, or piece or parcel of land, lying between Water street and the river Monongahela, with the appurtenances situate and being in the city of Pittsburgh."

The cause came on for trial at the circuit court for the east-

Mr Justice Baldwin did not sit in this case, he having been of counsel for the defendant in error, in the circuit court.

ern district of Pennsylvania at the April term 1829, and the jury found a general verdict for the plaintiff in the ejectment. The defendants prosecuted this writ of error.

On the trial, a bill of exceptions was tendered by the defendants to the ruling of the circuit court, as to the introduction of certain evidence, and also to several of the matters contained in the charge of the court; all which are particularly stated in the opinion of this court.

The case was argued by Mr Wilkins, for the plaintiffs in error; and by Mr Sergeant for the defendant.

Mr Justice M'LEAN delivered the opinion of the Court.

This suit was brought in the western district of Pennsylvania, to recover a lot of ground in the city of Pittsburgh, described in the declaration as lying between Water street and the river Monongahela. As the district judge could not sit in the cause, it was certified to the eastern district, under the act of congress.

The defendants in the court below appeared in behalf of the city and defended the action, on the ground that the entire slip of land between the north line of Water street and the river, was dedicated, at the time the town was laid out, as a street or right of way to the public.

The lessor of the plaintiff exhibited legal conveyances for the lot in controversy.

At the trial, various exceptions were taken to the ruling of the court, in the rejection of evidence offered by the defendants, and also to the charge of the court to the jury. These exceptions are brought before this court for consideration, by a writ of error.

The first assignment of error is, in substance, that the verdict being general, is void for want of certainty. That the finding of the jury did not settle the matter in controversy; and by consequence, did not authorise the judgment.

This must be considered as an exception to the sufficiency of the declaration; as any other matter embraced by it might have been considered on a motion for a new trial, but cannot now be noticed.

The description of the lot in the declaration is general, as lying between Water street and the river; but no doubt is

entertained that this is a sufficient description.    Formerly, it was necessary to describe the premises for which an action of ejectment was brought with great accuracy; but far less certainty is requisite in modern practice.    All the authorities say that a general description is good.    The lessor of the plaintiff, on a lease for a specific number of acres, may recover any quantity of less amount.

The rejection of the evidence contained in the depositions of Samuel Ewalt and John Finley, is the second error assigned.

To understand the force of this exception, it will be necessary to advert to a succinct history of the case.

There was vested in the Penn family a tract of land consisting of between five and six thousand acres that included the village of Pittsburgh, which at that time consisted of a small number of settlers, very few, if any of whom, had a title to the lots they occupied.    This tract was denominated a manor, as was the practice at that time to call large tracts of land, which had been surveyed within the charter of the original proprietor of Pennsylvania.    Being desirous of laying out a town at Pittsburgh, Tench Francis, who acted as the attorney of John Penn, Jun. and John Penn, addressed the following letter to George Woods, Esquire.

Philadelphia, 22d April 1784.

Sir—By directions of Messrs Penns, I take the liberty to request you to undertake the laying out of the town of Pittsburgh, and dividing all the other parts of the manor into proper lots and farms, and to set a value on each, supposing them clear of any kind of incumbrances, in doing of which, be pleased to make the proper inquiries, and ascertain the previous claims, pretended or not, of the present settlers, and all others set up.    The whole of the manor being intended for immediate sale, I wish you would point out the best method to effect it; and if agreeable to you to transact this business, inform me on what terms you will do it.    All expenses, and your charges for making the above survey, I will pay, &c.

In the month of May or June of the same year, Woods laid out the town of Pittsburgh, and also surveyed into out lots and small plantations, the residue of the manor; and made return to his principal of a copy of the town plat and the other sur-

veys. This return, and the whole proceedings of Woods, were sanctioned by the following letter.

Philadelphia, 30th September 1784.

Dear Sir—As attorney to John Penn, Junior, and John Penn, Esquires, late proprietors of Pennsylvania, I hereby approve of the plan you have made of the town of Pittsburgh, and now confirm the same, together with the division of the out lots and the other part of the manor of Pittsburgh. The several appliers, agreeable to your list furnished me, may depend on having deeds for their lots and plantations, whenever they pay the whole of the purchase money, &c.    Tench Francis.

George Woods, Esquire.

The original plat of the town of Pittsburgh, which was made by Woods, was given in evidence to the jury; from which it appears that the town was laid out into lots, streets and alleys, from the junction of the Alleghany and Monongahela rivers, extending up the latter to Grant street. With the exception of Water street, which lies along the bank of the Mononga-hela, all the streets and alleys of the town were distinctly marked by the surveyor, and their width laid down. Near the junction of the rivers, the space between the southern line of the lots and the Monongahela river is narrow, but it widens as the lots extend up the river.

It was contended by the defendants in the ejectment, that the before described slip of land was dedicated by the surveyor when he laid out the town, to the public as a street, or for other public uses. As the lot for which the ejectment was brought is situated in this narrow strip of land, the fact of dedication becomes material.

From the plan of the town, it does not appear that any artificial boundary, as the southern limit of Water street, was laid down. The name of the street is given, and its northern boundary; but the space to the south is left open to the river. All the streets leading south, terminate at Water street; and no indication is given in the plat, or in any part of the return of the surveyor, that Water street did not extend to the river, as it appears to do by the face of the plat.

The depositions of Ewalt and Finley were offered by the defendants, to prove the declarations of Woods at the time

[Barclay and others v. Howell's Lessee.]

the survey of the town was made.   Ewalt stated, that the survey was about to be commenced at a point which would have required him to remove his house, and that at his instance the place of beginning was changed.  On a remonstrance being made by several persons who had assembled, that Water street would be too narrow, Mr Woods observed to the party, "these houses will not remain or stand very long; you will build new houses and dig cellars, and bank out Water street as wide, till it comes to low water mark, if you please."   He observed, "that this street, to low water mark, should be for the use of the citizens and the public forever."

Finley states that Woods declared to the people of the town, that he would not change the old military plan; but that "Water street should be left open to the river's edge, at low water mark, for the use of said town; that they, the citizens, might use the same as landings, build walls, make wharves, or plant trees at their pleasure."

Several objections are made to the competency of this testimony.

It is insisted, that the declarations of Woods respecting the ground in controversy, did not come within the scope of his authority; and if they did, still, that they ought not to be received in evidence.

Woods had authority to fix upon the plan of the town, and survey it.   He had the power to determine the width of the respective streets and alleys, the size and form of the lots, to mark out the public grounds, and to determine on every thing so far as related to the town, which would add to its beauty, convenience, and value.   These were clearly within the scope of his powers, as they were essentially connected with the plan of the town, on which he was authorised to determine at his discretion.

But it is said that his acts, until sanctioned, were not binding upon his principal; and that as his principal was not present, his sanction, which was subsequently given, cannot be extended beyond what appears upon the town plat, which was returned by the agent.

The sanction, when given, related back to the original transaction; and gave equal effect to it, as if the principal had been present.   So far as valuations had been made of the lots occu-

pied by persons who had no titles, and who were to obtain titles on paying the prices fixed by Woods, it is very clear, that the principal could not be bound, by the act of confirmation, beyond what appeared upon the face of the return ; nor, if the agent had attempted, by any covert means, to give to the citizens of the town ground which he did not designate on his return, and which did not tend, directly, to increase the value of the town lots. But if the ground dedicated for a street or any other public use, was essentially connected with the town lots, and must have enhanced their value at the sale, the increased value thus realized, and a long acquiescence, would estop the original owner of the fee from asserting his claim, though the ground dedicated had not been so designated on the map.

There is nothing, however, on the plat which shows any limits to the width of Water street, short of the river on the south. If a line had been drawn along its southern limit, there would have been great force in the argument that the ground between such limit and the water was reserved by the proprietors. This would have been the legal consequence from such a survey, unless the contrary had been shown.

It must be admitted that the declarations of an agent, respecting things done within the scope of his authority, are not evidence to charge his principal, unless they were made at the time the act was done, and formed a part of the transaction. The declarations referred to were a part of the res gesta; they were explanatory of the act then being done; and they do not, as was contended, contradict the return, but tend to explain and confirm it.

The southern limit of Water street was the point of inquiry before the jury. It was a question of boundary, and governed by the same rules of evidence which are of daily application in such a case. In this view, were not the declarations of the person who fixed the boundary legal evidence? Not declarations casually made at a different time from that at which the survey was executed, but at the very time the act was done. The proof of such declarations should have been admitted by the circuit court; because, under the circumstances, they formed a part of the transaction.

The declarations of a surveyor which contradict his official

return, are clearly not evidence; nor ought they to be received, where he has no power to exercise a discretion as explanatory of his return, while he is still living, and may be examined as a witness.

The exception taken to the rejection of Coates's deposition is abandoned.

Several exceptions were made to the charge of the court to the jury.

1. "In saying that the property in question passed to Wilson, unless the jury should decide that the whole ground to the river was not only dedicated as a street, but that it must be capable of being used as such: that it was used as a highway or street, and that the slip of land, if it was not wholly given to the public as a street, or so much of it as was not so given, vested in the proprietors, as the undisputed owners of it."

As the fee to this property was vested in the Penn family, at the time the town was laid out, it is a clear proposition that such parts of the land as were not conveyed to the purchasers, or dedicated to the public, remained in the proprietors. But that part of the charge which instructed the jury, that it must appear that the ground to the river was not only capable of being used as a street, but had been so used, is conceived to be erroneous.

From the evidence in the cause, it appears, that the northern bank of the Monongahela, from its junction with the Alleghany, to the extent of the town plat, still remains elevated in many places; but several of the streets leading south, have been extended to the river, and they have been so graduated, as to admit of an easy approach to the water.

When complaint was made to Woods, that Water street would be too narrow, he observed, that its width might be artificially extended, for the convenience of the citizens, to the river. From this, it appears, that the ground was not then in a condition to be used as a street; and that much labour was required to place it in that situation. But, if it were dedicated for that purpose, at the time the survey of the town was made, is it essential, that it shall have been used as such within a limited time? This would hardly be pretended, as it regards other streets in the town. Suppose Market street or Wood street, leading north and south, had not been

improved by the city of Pittsburgh until this time, could the original proprietors claim it as their property? If the dedication of these streets to the public were a matter of doubt, and a jury were about to inquire into the fact; it is admitted, that their not having been improved or used as streets, would be a circumstance which the jury might weigh against the proof of dedication. But it would most clearly be error for the court to instruct the jury, that unless the ground claimed for these streets was in a situation to be used as streets, and had been so used, there could have been no dedication. This appears to have been the purport of the instruction to the jury, in regard to Water street. The words used were, that the jury must be " satisfied, not merely that the open space was used by the inhabitants of Pittsburgh or others, but that it was used as a highway or street; and that in weighing the evidence on this point, they would naturally inquire, whether, from the nature of the ground, it was capable of being so used."

From this instruction the jury were required to find against the right asserted in behalf of the city, unless the ground referred to had been used as a street or highway. This substituted the use for the right; and made the latter to depend upon the former. The right was not necessarily connected with the use within a limited period; as no such condition appears to have been imposed at the time it was granted. Whilst the circuit court might have called the attention of the jury to the fact, that the ground in controversy never having been used as a street, was a circumstance which they ought to weigh against the dedication contended for, it was error in them to say, in substance, there could be no right without the use. This withdrew from the jury the main point of inquiry, by substituting another; the existence or non-existence of which was not inconsistent with the principal fact. It was not essential for the city to show that the entire slip of land referred to had been used as a street, but it was essential to establish that it had been dedicated as such.

The second objection to the charge is, that the court instructed " the jury that no title in the corporation had been shown to a single foot of ground within the city; and that the acts of ownership, exercised by the corporation, were altogether inconsistent with the right asserted in behalf of the

[Barclay and others v. Howell's Lessee.]

public: and plainly conveying to the jury the opinion that the improper or peculiar use made of the ground in question by the corporation, gave the plaintiff a right to recover."

The inference drawn in the conclusion of this assignment of error, may not be fully sustained by the language of the court; but they did instruct the jury, that the acts of " ownership exercised by the corporation, in the way which had been stated, were altogether inconsistent with the right asserted in behalf of the public; since, if the whole of this ground to low water mark on the river, had been dedicated for a street, it was vested as such in the public, subject to be regulated and preserved by the corporation, and could not legally be treated and used as private property by that body."

The court here refer to certain wharves, which have been constructed by the city along the Monongahela, and on the ground claimed to be Water street. Connected with these wharves is a graduated pavement, so as to render access to them from the city easy; and a tax is imposed on steamboats and other vessels, for the use of them.

If this ground had been dedicated for a particular purpose, and the city authorities had appropriated it to an entirely different purpose; it might afford ground for the interference of a court of chancery, to compel a specific execution of the trust, by restraining the corporation, or by causing the removal of obstructions. But, even in such a case, the property dedicated would not revert to the original owner. The use would still remain in the public, limited, only, by the conditions imposed in the grant.

It does not appear, however, that the construction of wharves on the river, and the pavement of the ground, have, in the least degree, obstructed its use as a street. The pavement has, undoubtedly, promoted the public convenience; and if the whole line of the street were graduated and paved to the water as a public way, it would be much more valuable than in its present condition. The wharves cause no obstructions to the use of this ground as a street; and whether the city authorities have transcended their power in raising a revenue from them, by the improvements which have been made, is a question not necessarily involved in the case.

If that part of this ground which is connected with the wa-

ter, has been appropriated to other uses than as a right of way, they are not inconsistent with such right; but if such had been the case, on that ground the jury could not have rendered a verdict against the city. Such uses might have tended to show, that the dedication of this ground for a street, as contended for, had not been made; but no other or greater effect should have been given to them, had they been fully established, and their inconsistency with the right asserted clearly made out.

The third objection taken to the charge is, that the court instructed "the jury that the deeds of Ormsby, and to Craig and Bayard, were inconsistent with a dedication of a space south of the Water street lots to the river; and that these deeds conveyed the ground to the river, subject to the easement over a part of it."

The deed of Ormsby to Gregg and Sidney bears date the fifth day of November, in the year of our Lord one thousand seven hundred and ninety-eight, and was for " a certain lot of ground, situate in the town of Pittsburgh aforesaid, marked in the plan of said town, number one hundred and eighty-three, bounded by Front street, the river Monongahela, and lots numbered one hundred and eighty-two, and one hundred and eighty-four; it being the same lot or piece of ground which the honourable John Penn and John Penn, Jun., late proprietors of Pennsylvania, by their indenture, bearing date the second day of October one thousand seven hundred and eighty-four, did grant and convey unto the said Ormsby."

The deed to Craig and Bayard from the Penns, bears date the thirty-first day of December one thousand seven hundred and eighty-four; and conveyed to the grantees " and their heirs and assigns, thirty-two lots or pieces of ground, situate in a point formed by the junction of the two rivers Monongahela and Alleghany, in the town of Pittsburgh, marked in the general plan of said town made by Colonel Woods, numbers one, &c.; which said plan is recorded, or intended to be recorded, in the office for the recording of deeds for the county of Westmoreland."

The said lots are bounded northwardly by the said Alleghany river, eastwardly by Morberry or Mulberry street, southwardly by Penn street, and south-westwardly by he Monongahela river.

The agreement under which this deed was executed, is dated on the 22d day of January 1784, which was about six months before the town was surveyed. By this agreement, the Penns sold to Craig and Bayard " a certain tract of land in their manor of Pittsburgh, lying and being in a point formed by the junction of the rivers Monongahela and Alleghany: bounded on two sides by the rivers aforesaid," &c.

As this last deed covers ground which had been sold before the town was laid out, it is not perceived how it could be considered as inconsistent with the dedication contended for. It is true, the deed was not executed until after the town plat was formed; but it was executed by force of a purchase made prior to the survey of the town, and the purchaser had a right to insist on the boundaries designated in the agreement.

If the present contest were limited to the ground embraced in this agreement, and included in the general description of the deed, it might become a serious question, whether the description, in the deed, of the lots, by their numbers as designated on Woods's plan of the town, would not control that part of the description which refers to the Monongahela river. But, if it were admitted that this deed conveyed the land to the river, it could, under the circumstances, have no other effect than to restrict the dedication of the ground for a street to the extent of the deed.

The deed from Ormsby called for the lot by its number, as marked on the plan of the town, and bounded by Front street, the river Monongahela, and lots numbered one hundred and eighty-two, and one hundred and eighty-four. The construction given to these calls was, that the ground to the river was conveyed, subject to the easement over a part of it. And this deed, the jury was instructed, was inconsistent with the dedication of the ground to the water as a street.

It is contended, on the part of the defendant in error, that the charge given to the jury on this point, was the legal construction of the deed, and consequently was a matter for the court to determine.

The right of the court to decide on the legal effect of written instruments, cannot be controverted; but the question of boundary is always a matter of fact for the determination of the jury. It is the province of a court to instruct the jury

that they should fix the boundaries of the tract in controversy by an examination of the whole evidence; and that artificial or natural boundaries called for, control a call for course and distance. But it would withdraw the facts from the jury, if the court were to fix the boundaries called for, and then determine on the legal effect of the instrument.

Suppose the controversy had been between the city of Pittsburgh, and the persons claiming under Ormsby; who asserted a right to the ground, under his deed, to the river. The city in such a case would have contended, before the jury, that taking the calls of the deed together, they would limit the conveyance to the lot designated on the plan of the town; and would not this have been a question for the jury to determine, under the instruction of the court—an instruction, which should lay down the general principles of law in such a case, and the legal effect that would result from a certain state of facts; but, which should not take from the jury the right of determining on the limits of the lot, from the calls in the deed? These calls are established by evidence extrinsic of the deed; they are matters of fact, for the investigation of the jury.

In principle, there is no difference between the case under consideration and questions of boundary, which are of daily occurrence. It is as much the province of a jury to determine the limits of a lot in a city or town, as the limits of any tract of land, however large or small. And, if the court, in a question of boundary, may fix the limits of the grant, and then say what the legal effect of it shall be, there is nothing left for the action of the jury.

The deed from Ormsby called for a lot, designated on the town-plat one hundred and eighty-three, bounded by Front street, the river Monongahela, and lots numbered one hundred and eighty-two and one hundred and eighty-four.

The plat of the town which is referred to as containing a designation of the boundaries of the lot, fixes those boundaries as satisfactorily as any natural objects could fix them. Front street is called for, which lies parallel with Water street, as the northern boundary of the lot; and the adjoining lots lying east and west of it, are named as the eastern and western boundaries.

From this description, can any one doubt the intention of the grantor, and the understanding of the grantee? Does lot one hundred and eighty-three, as marked on the plan of the town, extend to the river? This will not be pretended; nor that lots one hundred and eighty-two and one hundred eighty-four extend to the river. The call for the river, then, in the deed in question, is inconsistent with the other calls in the deed. By the town plat, the southern boundary of the lot is limited by Water street, and by a call for this boundary it is as fixed and certain as the call for the river. The same may be said of the eastern and western boundary of the lot. Shall these calls be all disregarded or controlled, by the single call for the natural boundary?

In a late case this court decided, that a call in a patent for a different county from that in which the land was situated, might be controlled by other calls in the patent. Such was the charge given to the jury in the court below, and it was sustained by this court.

The circuit court, therefore, instead of saying to the jury that the calls in this deed, and the one to Craig and Bayard, were inconsistent with the dedication of the ground referred to, should have instructed them, that the different calls ought to be taken together; and that the calls for the river might be controlled by the other calls in the deeds, if the jury should be satisfied that such call had been inserted through inadvertence or mistake.

The fourth and last exception taken to the charge of the court is, that they erred in instructing the jury, "that if a street or streets leading to the Monongahela river were necessary to the enjoyment, by the inhabitants, of their property in the town, derived from persons under whom the plaintiff claimed, they are entitled to have them laid off over the land in dispute, of right, and not of favour; and that the law points out a mode by which this right may be enforced."

This instruction does not involve a point which was material in the case: and though it were erroneous, it might not afford ground for the reversal of the judgment of the circuit court. Whether this right existed or not, it is not conceived how it could have had any influence with the jury.

The court seem to refer to the law of Pennsylvania, regulating the opening of public roads. But the establishment of

a public road cannot be claimed as a matter of right. An application must be made in the first instance, by petition to the court of quarter sessions; a view of the proposed road is directed, and its establishment depends upon the report of the viewers and other necessary sanctions.

This law, however, it is insisted, could have no operation in the city of Pittsburgh; that its streets and alleys are opened and regulated under the corporate authorities, and not by the provisions of the road law.

It is not deemed necessary, in deciding the points raised in this case, to notice all the questions discussed by the counsel in their arguments at the bar.

Whether Water street extended to low or high water mark, can be of no importance in the present controversy. If its southern boundary be limited by high water mark, it is clear that the proprietors parted with all their right. It is admitted by both parties, that the river Monongahela, being a navigable stream, belongs to the public; and a free use of it may be rightfully claimed by the public, whatever may be the extent of its volume of water. If Water street be bounded by the river on the south, it is only limited by the public right. To contend that between this boundary and the public right, a private and hostile right could exist, would not only be unreasonable, but against law.

Tench Francis, the attorney in fact for the Penn family, and the agent who succeeded him, must be considered, for some purposes, as the principal in these transactions. His principals were in Europe; and to his discretion and superintendence they, of necessity, consigned the management of their property in this country. The long acquiescence, therefore, in the plan of the town, as returned by Woods, affords a strong presumption against the right asserted by the plaintiff below in this action.

The town was laid out in the spring or summer of 1784; no act was done by the proprietors showing any claim to the land in controversy, until September 1814, when the deed to Wilson was executed. Here is a lapse of about thirty years, within which no right is asserted by the Penn family, hostile to that which was exercised by the city, in the use of this ground, to the extent which its means enabled it to improve,

and the public convenience seemed to require.   A title whicl has remained dormant for so great a number of years, and while the property was used for public purposes, and necessarily within the knowledge of the agents of the proprietors, is now asserted under doubtful circumstances of right.   In some cases a dedication of property to public use, as for instance a street or public road, where the public has enjoyed the unmolested use of it for six or seven years, has been deemed sufficient evidence of dedication.  This lapse of time, connected with the public use, and the determination expressed by the agent at the time the town was laid out to dispose of the whole of the manor, affords strong grounds to presume that no reservation of any part of the manor was intended to be made; and that the slip of land in controversy was not reserved. These were facts proper for the consideration of the jury in determining the fact of dedication.   They were calculated to have a strong influence to rebut the presumptions relied on by the plaintiff in the court below.

If it were necessary, an unmolested possession for thirty years would authorise the presumption of a grant.   Indeed, under peculiar circumstances, a grant has been presumed from a possession less than the number of years required to bar the action of ejectment by the statute of limitations.

By the common law the fee in the soil remains in the original owner, where a public road is established over it; but the use of the road is in the public.   The owner parts with this use only, for if the road shall be vacated by the public, he resumes the exclusive possession of the ground; and while it is used as a highway, he is entitled to the timber and grass which may grow upon the surface, and to all minerals which may be found below it.   He may bring an action of trespass against any one who obstructs the road.

In the discussion of this case, the same doctrine has been applied by the counsel for the defendant in error to the streets and alleys of a town; but in deciding the points raised by the bill of exceptions, it is not necessary to determine this question.

Where the proprietor of a town disposes of all his interest in it, he would seem to stand in a different relation to the right of soil, in regard to the streets and alleys of the town, from

the individual over whose soil a public road is established, and who continues to hold the land on both sides of it. Whether the purchasers of town lots are not, in this respect, the owners of the soil over which the streets and alleys are laid, as appurtenant to the adjoining lots, is a point not essentially involved in this case.

If the jury shall find that the ground in question was dedicated to the public as a street or highway, or for other public purposes, to the river, either at high or low water mark, the right of the city will be established, and the plaintiff in the ejectment must consequently fail to recover.

Upon a deliberate consideration of the points involved in the case, this court are clearly of the opinion, that the judgment of the circuit court was erroneous, and it is therefore reversed, and the cause remanded for further proceedings.