MATILDA GILDEHAUS *et al.* v. CATHARINE M. WHITING *et al.*

1. EJECTMENT — *Possession Following Title.* Where there is no adverse holding of real estate, the possession follows the property in the land, and is in him who has the title.

2. EVIDENCE *Tending to Prove Title in Grantee — Not Conclusive.* The recording of a conveyance of real estate, properly acknowledged by the grantor, although the grantor had no title; the payment of taxes for a number of years by the grantee upon the real estate described in the deed; a public claim of title to the premises without any actual possession thereof by the grantee, tend to prove the ownership of the real estate in the grantee, but such evidence is not conclusive.

3. ADVERSE POSSESSION — *No Title under Statute of Limitations.* C. purchased of G. in November, 1859, two lots in Topeka; M. executed to C. on November 4, 1859, a conveyance therefor, duly acknowledged, which was properly filed for record; neither G. nor M. ever had any title or possession of the lots; the lots continued wholly vacant and unimproved until 1882; C. conveyed the lots by warranty deed on June 12, 1860, to G.; G. conveyed the lots by warranty deed on April 6, 1868, to H. G. & Co.; C. and G. never paid any taxes thereon, and in no way improved or made use of the lots; H. G. & Co. in 1868 redeemed the lots from all prior taxes, and paid taxes up to and including 1881; the heirs of one W., who had obtained title to the lots prior to 1859, took actual possession of the lots in 1882, improved the same, and paid the taxes from 1882 to 1884; on June 11, 1884, the heirs of H. G. & Co. brought their action of ejectment against the heirs of W. to recover possession of the lots. *Held,* That it cannot be said, as against the special findings and conclusions of the court to the contrary, that the heirs of H. G. & Co. established such an adverse holding of the lots as to be entitled to them under the statute of limitations.

4. Lost Deed, *Record of, When Competent Evidence.* Where a written conveyance or deed has been copied in the proper books of the office of the register of deeds, prior to October 31, 1868, and such deed has not been acknowledged as prescribed by the statute, the book of records of the register's office containing such deed is competent evidence under § 28, ch. 22, Comp. Laws of 1885, to prove the deed, when it is shown by the party offering the record that the original deed is lost, or not within his control.

## Error from Shawnee Superior Court.

On June 11, 1884, plaintiffs commenced their action in the superior court of Shawnee county, against the defendants, to recover the possession of lots 370 and 372 on Jackson street, in the city of Topeka, and also to recover $100 damages for the unlawful withholding of the possession of the same. On July 3, 1884, the defendants filed an answer containing a general denial. Trial had at the September term of the court for 1886, a jury being waived. The court made and filed the following findings of fact:

"1. The lots described in the plaintiffs' petition, to wit: Lots numbered 370 and 372, Jackson street, city of Topeka, in this county, were a part of section 31, township 11, range 16, entered in the name of Isaiah Walker in February, 1859.

"2. Said section 31 was conveyed by said Isaiah Walker and Mary his wife to Cyrus K. Holliday, as trustee of the Topeka association, July 1, 1859, by special warranty deed, duly acknowledged and recorded.

"3. The city of Topeka was duly platted, and the plat thereof recorded in 1859; and said plat covered and included said section 31.

"4. One H. M. Moore conveyed to Amos D. Craigue lots 368, 370 and 372 on Jackson street, city of Topeka, by warranty deed dated November 4, 1859, which deed was duly acknowledged and recorded.

"5. Amos D. Craigue conveyed the lots mentioned in the next finding to William Grall by warranty deed dated June 12, 1860, which deed was duly acknowledged and recorded.

"6. William Grall and Margaret his wife conveyed to H. Gildehaus & Co. of St. Louis, Missouri, said lots 370 and 272, on Jackson street, by their warranty deed dated April 6, 1868, which deed was duly acknowledged and recorded.

"7. Said H. Gildehaus & Co., in 1868, redeemed said lots

370 and 372 from sales from all prior taxes, and they paid taxes on said lots for the years 1868, 1869, 1870, 1871, 1872, 1873, 1874, 1875, 1876, 1880, and 1881. It is not shown who paid the taxes on said lots for the years 1877, 1878 and 1879.

"8. The firm of H. Gildehaus & Co. was composed of Henry Gildehaus, Charles R. Dieckriede and Charles Wolfing. The plaintiffs are the heirs at law of said Henry Gildehaus; and said Henry Gildehaus duly succeeded to the interest of said firm of Henry Gildehaus & Co. in and to said lots 370 and 372.

"9. Said lots 370 and 372 remained wholly vacant and unoccupied and unimproved from the time they were laid out and platted in 1859, until sometime in the summer of 1882, when the defendant Catharine M. Whiting took possession of said lots, fenced them, and erected a dwelling house on them and an adjoining lot owned by her.

"10. The defendant Catharine M. Whiting is the widow, and the other two defendants are the only children of Charles C. Whiting, deceased. Said Charles C. Whiting resided in the city of Topeka from sometime in 1855 until January 1870, when he died, leaving the defendants his heirs-at-law. The defendants have resided in Topeka ever since the death of said Charles C. Whiting.

"11. One J. Findley Hill was one of the original shareholders of the Topeka association, and was owner of share 96, which was allotted to him by said association. Lots 370 and 372 on Jackson street belonged to said share 96, being duly drawn to that share in April, 1856.

"12. J. Finn. Hill conveyed lots 368, 370 and 372 on Jackson street, in Topeka, to Charles Whiting, by deed dated June 14, 1858. Said deed shows on its face that it was 'signed, sealed and delivered in the presence of H. M. Moore.' Said deed was not acknowledged, but it was recorded in volume C. of deeds of Shawnee county, on July 8, 1858.

"13. H. M. Moore by special warranty deed conveyed lots 368, 370 and 372, Jackson street, to T. Tucker, August 8, 1859, which deed was duly witnessed, acknowledged, and recorded.

"14. William Grall and Margaret his wife, by general warranty deed, conveyed said lots 370 and 372, on Jackson street, to Edward Thompson, November 13, 1860, which deed was duly acknowledged and recorded.

"15. William Grall and Margaret his wife, by general

warranty deed, conveyed lots 368, 370 and 372, on Jackson street, to Meyer D. Haas, June 22, 1864, which deed was duly acknowledged and recorded.

"16. Since taking possession thereof as aforesaid, in 1882, the defendant Catharine M. Whiting has been in possession of said lots 370 and 372, and has since paid the taxes levied and assessed against the same.

"17. None of the plaintiffs have at any time resided in the state of Kansas.

"18. The defendant did not, nor did either of them, know until sometime in the spring or early summer of 1882, that said Charles C. Whiting, at any time during his life ·or at the time of his death, had any interest, claim or title in or to said lots 370 and 372, or in or to either of said lots."

And thereon the court made and filed the following conclusions of law:

"1. The plaintiffs have no such legal or equitable title to said lots 370 and 372 on Jackson street as will support this action, and are not entitled to recover possession of said lots.

"2. Upon the facts sustained by the evidence and found as aforesaid, the defendants are entitled to judgment for costs."

Subsequently, the court rendered judgment against the plaintiffs and in favor of the defendants for all their costs. The plaintiffs excepted, and bring the case here.

*Jetmore & Son,* for plaintiffs in error.

*Vance & Campbell,* for defendants in error.

The opinion of the court was delivered by

HORTON, C. J.: This was a controversy in the court below over the title to lots 370 and 372, on Jackson street, in the city of Topeka. Amos D. Craigue bought these lots sometime in 1859 from E. C. K. Garvey, for an old watch, but obtained his deed for them from H. M. Moore, on November 4, 1859. This deed was duly acknowledged and recorded. It does not appear from any of the testimony contained in the record that either Garvey or Moore ever had any title or possession of these lots. Prior to the date that Moore executed the deed to Craigue, he had conveyed by a special warranty deed these lots to T. Tucker, on August 8, 1858. This

deed was also duly acknowledged and recorded. On June 12, 1860, Craigue conveyed the lots to William Grall. On April 6, 1868, Grall and wife conveyed the lots to Henry Gildehaus & Co., of St. Louis. Henry Gildehaus succeeded to the interest and title to the lots of Henry Gildehaus & Co., and plaintiffs are his heirs-at-law.

These lots were formerly embraced in section 31, township 11, range 16, entered in the name of Isaiah Walker in February, 1859. July 1, 1859, Walker and wife conveyed this section to Cyrus K. Holliday, as trustee of the Topeka association. The plat of the city of Topeka was recorded in 1859, and that plat included said section 31. On June 14, 1859, J. Finn. Hill conveyed the lots to Charles Whiting. This deed recites that "it was signed, sealed and delivered in the presence of H. M. Moore." The deed was not acknowledged, but was recorded in volume C of deeds, in the office of the register of deeds of Shawnee county, on July 8, 1858. Hill was one of the original share-holders of the Topeka association, and the owner of share 96. These lots were drawn and allotted to that share in April, 1856. Whiting died in January, 1870, and the defendants are his only heirs. Gildehaus & Co., in 1868, redeemed the lots from prior taxes, and paid the taxes thereon from 1868 up to and including 1876, and also paid the taxes for 1880 and 1881. The testimony does not show who paid the taxes for the years 1877, 1878, and 1879. The lots remained vacant and unoccupied from the time they were laid out and platted in 1859, until the summer of 1882, when Catharine Whiting, one of the defendants, took possession of the lots, fenced, and otherwise made improvements thereon. Since said time she has paid all the taxes thereon.

There was evidence introduced to prove the ownership of the plaintiffs by showing that they and their grantors claimed the lots, and that they had paid taxes thereon for many years; but as was said in *Gilmore v. Norton*, 10 Kas. 491: "This kind of evidence is only *prima facie* evidence, and must always give way to stronger evidence;" and if the defendants were mere trespassers or

2. Evidence tending to prove title in grantee.

wrongdoers, this evidence, perhaps, would have been sufficient to have established the ownership of the plaintiffs to the lots. But the disclosures of the other testimony showed that plaintiffs' source of title commenced with Moore, who had neither title nor actual possession. There is nothing indicating that Moore or Garvey ever had a shadow of title to the lots. As the lots were wholly vacant and unoccupied, and as the recorded title under which the plaintiffs claim, conveyed or transferred no actual or substantial title or interest, they cannot, as against the special findings of the court, claim the property under the statute of limitations. To constitute an adverse possession sufficient to defeat the right of action of a party who has the legal title, the possession must be hostile in its inception, and so continue without interruption for the period prescribed by the statute of limitations. (*Dewey v. McLain*, 7 Kas. 126.)

*3. Adverse possession—no title under statute of limitations.*

In *Roots v. Beck*, (Ind.) 9 N. E. Rep. 698, it was held that—

"Any adverse possession the effect of which is to oust the true owner, and give to him a right of action, sets the statute of limitations in motion. When the bar of the statute becomes complete, however destitute of the color of title such occupancy may have been under, to the extent that it was actual, visible and continuous, a title by prescription arises in the adverse occupant. This title is in all respects equal to a conveyance in fee. The only distinction which can be recognized between title acquired under the statute of limitations by adverse occupancy under claim and color of title, and without such claim or color, is that in the latter case title will only be coëxtensive with actual, visible, continued occupancy; while in the former, color of title may, by construction, embrace lands only part of which were thus actually occupied."

In Angell upon Limitations, § 390, it is said:

"The clearest and most comprehensive definition of a disseizin and adverse holding, perhaps, is an actual, visible, and exclusive appropriation of land, commenced and continued under a claim of right, either under an openly avowed claim, or under a constructive claim arising from the acts and circumstances attending the appropriation to hold the land against him who was seized."

And in the same section it is said: "It is the occupation with an intent to claim against the true owner which renders the entry and possession adverse;" and "that it is the intention to claim title which makes the possession of the holder of the land adverse, is the doctrine upon which the decision in every case proceeds."

In *Murphy v. Doyle*, (Minn.) 33 N. W. Rep. 220, it was said:

"As to what will constitute adverse possession such as will work a disseizin of the true owner, is a subject which had afforded a wide field for judicial discussion and decision. All the authorities agree that the possession must be actual, visible, and exclusive; but as to what will constitute such a possession, or as to what shall be deemed the extent of it under a given state of facts, there has been some diversity of views. The doctrine of the supreme court of the United States is, that to constitute adverse possession there need not be a fence or a building; that it is sufficient if visible and notorious acts of ownership have been exercised over the premises for the time limited by statute. (*Ewing v. Burnet*, 11 Pet. 53.) It is difficult to lay down a precise rule applicable to all cases, as much must depend upon the nature and situation of the property, and the uses to which it can be applied. For example, in the case of a farm, if the possession is open and notorious, comporting with the ordinary management of farms, it is not necessary that the whole farm be either improved or inclosed, at least where the unimproved part, as woodland, is subservient to and connected with that which is improved; and for the same reason the rule requiring actual and visible occupancy will be more strictly construed in an old and populous country, where land is usually improved and inclosed, than in a new country recently settled, in which the land is only partially improved. Again, where the occupant enters under color of title through some deed or written instrument purporting to be a conveyance, he stands in a different position from a mere naked disseizor. He is presumed to have intended his entry to be coëxtensive with the description contained in his deed, although the actual improvements are only on a part of the tract. The general doctrine of the courts of the United States is that where the occupant, or those under whom he claims, entered into possession under claim of title, founding such claim upon some written instrument as being

a conveyance of the premises in question, and there has been continued occupation of some part of the land included in such conveyance, he or they will be deemed to have been in the adverse possession of the whole of such premises if not in the adverse possession of anyone else."

In *Weber v. Clarke*, (Cal.) 15 Pac. Rep. 434, we find the following:

" 'By actual possession,' said Field, C. J., in a leading case, 'is meant a subjection to the will and dominion of the claimant, and is usually evidenced by occupation, by a substantial inclosure, by cultivation, or by appropriate use, according to the particular locality and quality of the property.' (*Coryell v. Cain*, 16 Cal. 573. And see *Brumagim v. Bradshaw*, 39 Cal. 44.) Where, however, there is such subjection to the will and dominion of the claimant, manifested in some appropriate manner, residence upon the property is not essential, (*Barstow v. Newman*, 34 Cal. 91; *Goodrich v. Van Landigham*, 46 id. 601; *Kelly v. Mack*, 49 id. 524;) nor in such case is an inclosure necessary, (*Hicks v. Coleman*, 25 Cal. 132; *McCreery v. Everding*, 44 id. 252; *Sheldon v. Mull*, 67 id. 300, 7 Pac. Rep. 710.) In the case of grazing land, in a grazing country, herding sheep upon it would seem to be an 'appropriate use, according to the particular locality and quality of the property.' Accordingly, we find that in two cases pasturage of cattle within an inclosure was held to be sufficient possession against intruders, (*Southmayd v. Henley*, 45 Cal. 102; *Pierce v. Stuart*, 45 id. 280;) and in *Sheldon v. Mull*, 67 Cal. 300 and 301, 7 Pac. Rep. 710, it was held that pasturage without an inclosure was sufficient; the cattle being confined to the land by herders. There must, of course, be some definite boundaries to the possession; but it has been held, in a long line of decisions, that where a party enters under color of title, and has actual possession of a part of the whole tract, he has constructive possession of the whole tract described in the document. . . . As stated above, the defendant's pasturage was only during the grazing season, that is, from February to July; the land during the balance of the year being ' not pasturable.' We think, however, that this was sufficient, there being no one on the land meanwhile. It is a settled rule, with reference to cases of this character, that it is sufficient if, in the language of Field, C. J., in *Coryell v. Cain*, above quoted, the dominion and control is 'by appropriate use according to the particular locality and quality of the property.' In this regard Crockett,

J., delivering the opinion in *Brumagim v. Bradshaw*, 39 Cal. 46, said: 'The general principle which underlies all this class of cases is, that the acts of dominion must be adapted to the particular land, its condition, locality, and appropriate use. The philosophy of the rule is, that by such acts the party proclaims to the public that he asserts an exclusive ownership over the land, and the acts which he performs are in harmony with his claim of title.' "

In 3 Washburn on Real Property, 145, it is said:

"In view of what courts have themselves admitted, the difficulty, if not impracticability of laying down any precise rule by which, in all cases, the question of adverse possession may be determined, it seems desirable, even at the hazard of repetition, to ascertain what rules courts have recognized in fixing a criterion by which to determine what cases come within the effect of the statute of limitations. In the first place, inasmuch as the title of the true owner may, by the application of this statute, be often divested by the wrongful act of another, the law is stringent in requiring clear proof of the requisite facts. There must be, first, an actual occupancy, clear, definite, positive, and notorious; second, it must be continued, adverse and exclusive during the whole period prescribed by the statute; third, it must be with an intention to claim title to the land occupied, or in other words, the fact of possession, and the *quo animo* it was commenced and continued, are the only tests."

It is further said by Washburn, that—

"Taking a deed is not enough to make an adverse possession; it must be followed by an actual entry; and it is only from the time of such entry being made that the statute of limitations begins to run in favor of him who claims under it." (Vol. 3, p. 149.) "But, where there is no adverse holding, the possession follows the property in the land, and is in him who has the title." (Vol. 3, p. 138.) "Where a party claims by a disseizin ripened into a good title by lapse of time, as against the legal owner, he must show an actual, open, exclusive, adverse possession of the land." (Vol. 3, p. 139.)

1. Possession following title.

Counsel for plaintiffs contend, however, that plaintiffs and those under whom they hold had such adverse possession as to successively plead in bar the statute. *Ellicott v. Pearl*, 10

Pet. 412; *Ewing v. Burnet,* 11 id. 41; *Langworthy v. Myers,* 4 Iowa, 18; *Draper v. Shoot,* 25 Mo. 197; *Ludlow's Heirs v. McBride,* 3 Ohio St. 241, and some other cases, are cited in support of the proposition that, to constitute an adverse possession, no fence, building or other improvements are necessary. We may assent to all that is decided in those cases, and yet upon the findings of the court we cannot reverse the judgment, and decide that the statute of limitations must prevail.

In *Ellicott v. Pearl,* it was decided:

"The assumption that there can be no possession to defeat an adverse title, except in one or other of these ways, that is, by an actual residence or an actual inclosure, is a doctrine wholly irreconcilable with principle and authority. Nothing can be more clear than that a fence is not indispensable to constitute possession of a tract of land. The erection of a fence is nothing more than an act presumptive of an intention to assert an ownership and possession over the property; but there are many other acts, which are equally evincive of such an intention of asserting such ownership and possession; such as entering upon land and making improvements thereon; raising a crop of corn; felling and selling the trees thereon, under color of title. An entry into possession of a tract of land, under a deed containing specific metes and bounds, gives a constructive possession of the whole tract, if not in any adverse possession, although there may be no fence or inclosure round the ambit of the tract, and an actual residence only on a part of it. To constitute actual possession, it is not necessary that there should be any fence or inclosure of the land. Where there has been an entry on land under color of title by deed, the possession is deemed to extend to the bounds of that deed, although the actual settlement and improvements were on a small parcel only of the tract. In such a case, where there is no adverse possession, the law construes the entry to be co-extensive with the grant to the party, upon the ground that it is his clear intention to assert such possession."

In *Ewing v. Burnet,* it was said:

"It is well settled that to constitute an adverse possession there need not be a fence, building, or other improvements made. (10 Pet. 442.) It suffices, for this purpose, that visible and notorious acts of ownership are exercised over the premises in controversy for twenty-one years after an entry under

claim and color of title. So much depends on the nature and situation of the property, the uses to which it can be applied, or to which the owner or claimant may choose to apply it, that it is difficult to lay down any precise rule adapted to all cases. But it may with safety be said that where acts of ownership have been done upon land, which from their nature indicate a notorious claim of property in it, and are continued for twenty-one years, with the knowledge of an adverse claimant without interruption, or an adverse entry by him for twenty-one years, such acts are evidence of an ouster of a former owner, and an actual adverse possession against him, if the jury shall think that the property was not susceptible of a more strict or definite possession than had been so taken and held. Neither actual occupation, cultivation nor residence is necessary to constitute actual possession ( 6 Pet. 513 ) when the property is so situated as not to admit of any permanent useful improvement, and the continued claim of the property has been evidenced by public acts of ownership, such as he would exercise over property which he claimed in his own right, and would not exercise over property which he did not claim. Whether this was the situation of the lot in question, or such was the nature of the acts done, was the peculiar province of the jury. The evidence, in our opinion, was legally sufficient to draw the inference that such were the facts of the case; and, if found specially, would have entitled the defendant to the judgment of the court in his favor."

In *Langworthy v. Myers*, supra, the opinion recites that—

"The jury, we think, were properly told by the court that the actual possession of real estate may be shown by an act of possession, as where the owner goes upon the land to take possession, or to exercise any other act of ownership; and if they believe that the plaintiff exercised over the premises those acts of ownership usually exercised by owners over land on which they do not actually reside, they might infer actual possession; and that it was not necessary to such actual possession that the premises should be surrounded by a fence, or built upon. (*Bell v. Longworth*, 6 Ind. 274.) The premises, it is shown, lie adjoining other lands claimed by plaintiff. He had procured the same to be surveyed, the boundaries marked, and stakes to be set up at the corners. He had subdivided the same into smaller lots, and staked them off in the usual manner of laying off town lots, so that the corners and boundaries were visible, and had been offering them for sale. These

were all acts from which the jury were told that they were
authorized to infer the possession of the land by the plaintiff;
and, having found that they amounted to actual possession,
we think the court did not err in refusing to set aside the
verdict."

In *Draper v. Shoot,* supra, Scott, J., said:

"We do not maintain that the payment of taxes is evidence
of an ouster of a true owner; but in a question of adverse
possession, which depends on so many circumstances, such
payment is a fact to be weighed by a jury in considering it.
It would be an argument against one claiming to hold land,
that he should for twenty years fail to pay the annual assess-
ments upon it.   If unexplained, such omission would certainly
weaken the pretense that he claimed the land as his own, as
such conduct is contrary to the course of men of ordinary
prudence in relation to property to which they set up a claim.
The payment of taxes may go to the jury with other circum-
stances; and this was a case in which such a fact was very
appropriate for the consideration of the triers of the fact."

In *Lessee of Ludlow's Heirs v. McBride,* 3 Ohio St. 241,
it was said:

"The doctrine is now too well settled to be disturbed, that
a prior possession is presumptive evidence of title; and unex-
plained or uncontradicted, is a sufficient title to recover upon,
in ejectment, against a mere intruder.   The authorities upon
this point are numerous, and decisive, both in the English
and American courts.   It is not necessary that there should
be a continued possession for twenty years, to furnish this
presumption of right.   Such possession, when both adverse
to all others and continued, rises at length into a right, even
against the legal owner of the fee, if once within the protec-
tion of the statute of limitations; and when continued for
less than twenty years, may prevail, as a presumptive right,
until rebutted by proof of prior possession, right of succes-
sion, legal title, or other evidence sufficient to defeat such pre-
sumption."

The only adverse possession attempted to be proved was
the obtaining by Craigue from Moore of his deed, dated No-
vember 4, 1859; the recording of the same; the giving of a
mortgage on the property to R. M. Ludington for $170; the
recording of that mortgage; the payment of the taxes by

Gildehaus & Co.; and the general claim of ownership. There was no actual settlement and improvement on a part or parcel of the lots, as in the *Ellicott case.* There was no finding in this case in favor of plaintiffs of adverse possession, as in the *Ewing case.* In the *Langworthy case,* the lot adjoined other lands claimed by the plaintiff; he˙ procured the same to be surveyed, the boundaries marked, and stakes to be set out at the corners; he subdivided the lot into smaller lots, and staked them off in the usual manner of laying off town lots, so that the corners and boundaries were visible; and then offered them for sale. The jury were told that these were acts which authorized them to infer the possession of the lot by plaintiff; and, having found that they amounted to actual possession, the supreme court said that the trial court did not err in refusing to set aside the verdict. That case is very different from this.

In the *Draper case,* the court said that—

"Neither actual occupation, cultivation nor residence is necessary where the property is so situated as not to admit of any permanent, useful improvement."

But here the property was so situated as to admit of actual occupation and residence. In that case, also, the court instructed the jury:

"To make good the defense of the defendants under the statute of limitations, the jury must find that the defendants, or those under whom they claim, or their tenants, had actual, continuous, visible possession of said lot, claiming the same adversely to the plaintiff, and those under whom he claims, for twenty years next before the commencement of this suit. This possession is not constructive, but it must have been by occupation or cultivation, or by other acts of ownership, which are visible, notorious, and continuous. If these facts are found by the jury, they should find a verdict for the defendants; if not, as to this defense, the plaintiff should have a verdict."

Upon this instruction, the defendants succeeded on the statute of limitations as a complete bar to the plaintiff's action. The supreme court approved this instruction, and affirmed the judgment.

In the case of *Ludlow's Heirs*, the ancestor of the plaintiffs was in possession of a large tract of land, of which the lot in dispute formed a part, and while in possession, died.   By his death, his estate in the lot and his possession of it were cast upon his heirs.   The court in that case merely decided that "Prior possession by an ancestor claiming title is sufficient for the heir to recover upon in ejectment against subsequent possession of less than twenty years without title."

The last cases quoted, and all the other cases cited by counsel for plaintiffs, do not, when critically examined, conflict with the finding of law of the trial court, that "Upon the facts sustained by the evidence and found as aforesaid, the defendants are entitled to judgment for costs."

It is true that Whiting in his lifetime made no open or public claim to the lots.   He may have forgotten his purchase from Hill, or may have regarded the lots of so little value as not to be worth any consideration or mention ; and if Craigue or Grall had purchased the lots, or made improvements thereon at the instance of Whiting, or on account of his silence concerning his title, the law might raise an estoppel against him and his heirs from claiming the property.   It does not appear from any evidence in the record, or attempted to be offered upon the trial, that Craigue consulted or talked with Whiting before he made his purchase from Moore on November 4, 1859.   It does not appear from any evidence in the record, or attempted to be offered upon the trial, that Grall consulted or talked with Whiting before he made his purchase from Craigue on June 12, 1860.   It does not appear from any evidence in the record, or attempted to be offered upon the trial, that Gildehaus & Co. consulted or talked with Whiting before they made their purchase from Grall on April 6, 1868.   During the time that Craigue and Grall claimed the lots, it does not appear from the record that they ever paid any taxes thereon.   Whiting died about two years after Gildehaus & Co. obtained their deed from Grall; but in redeeming the lots from taxes, and in paying subsequent taxes thereon, they did not act upon any statements made to them

by Whiting, nor upon his advice or consent; therefore the evidence excluded by the court, attempted to be given by the witness Craigue, was incompetent and wholly irrelevant. It did not show or tend to show that any money was paid, or any improvements were made, or any actual possession taken by anyone at the instance or request or consent of Whiting. Craigue was in partnership with Whiting in 1868 and 1869, two years or more before his death. At this time Craigue had no interest in the lots, and Whiting was under no legal or moral duty to assert his claim or title. At the time that Whiting asked Craigue what he had given for his billiard table, Craigue had no interest in the lots, as he had already sold them to Grall, and therefore this conversation was not evidence to go to the court.

It is next claimed that the trial court committed error in permitting to be read the deed from Hill to Whiting, of the date of June 14, 1858, from the records in the office of the register of deeds of Shawnee county. There was no proof of the signature to the deed, but it was recorded July 8, 1858. It was permitted to be read in evidence under the provisions of § 28, ch. 22, Comp. Laws of 1885. This reads:

"All instruments of writing now copied into the proper books of the office of register of deeds of the several counties of this state, shall, upon the passage of this act, be deemed to impart to subsequent purchasers and incumbrancers, and all other persons whomsoever, notice of all deeds, mortgages, powers of attorney, contracts, conveyances, or other instruments, so far as, and to the extent that, the same may be found recorded, copied [or] noted in said books of record, notwithstanding any defects existing in the execution, acknowledgment, recording or certificate of recording the same; and the record of any such instrument, or a duly-authenticated copy thereof, shall be competent evidence whenever, by the party's own oath or otherwise, the original is shown to be lost, or not belonging to the party wishing to use the same, or not within his control; *provided*, that nothing herein contained shall be construed to affect any rights heretofore acquired in the hands of subsequent grantees, assignees, or incumbrancers."

This statute took effect October 31, 1868, subsequent to the

recording of the deed from Hill to Whiting. Therefore the trial court committed no error in permitting the deed to be proved by the records of the office of the register of deeds under the following provision of said § 28:

4. Lost deed, record of, when competent evidence.

"And the record of any such instrument, or a duly-authenticated copy thereof, shall be competent evidence whenever, by the party's own oath or otherwise, the original is shown to be lost, or not belonging to the party wishing to use the same, or not within his control." (*Clark v. Lord*, 20 Kas. 390.)

There are some other matters discussed in the briefs, but, after an examination of the same, we perceive no error therein.

As to the execution of the deed from Hill to Whiting before any plat was made of the city of Topeka, see *Bemis v. Becker*, 1 Kas. 226, and the cases there cited.

The judgment of the district court will be affirmed.

All the Justices concurring.