HAMILTON *v.* WEBER.

1. APPEAL AND ERROR—QUESTIONS REVIEWABLE—REASONS AND GROUNDS FOR APPEAL.

Appellants may not claim on appeal reception in evidence of a certain exhibit was error, where they did not set forth in their reasons and grounds for appeal that its admission was error (Court Rule No 66, § 3 [1945]).

2. EJECTMENT—ADVERSE POSSESSION—EVIDENCE—PERMISSIVE—CONTINUITY.

Evidence in ejectment by holder of record title *held,* to show that defendants who claimed title to disputed tract by adverse possession had but permissive possession and that even such was not entire or continuous.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 3 Am Jur, Appeal and Error §§ 588, 772.
[2, 4] 18 Am Jur, Ejectment § 57.
[3] 3 Am Jur, Appeal and Error § 817.
[5] 1 Am Jur, Adverse Possession § 136.
[6] 1 Am Jur, Adverse Possession § 126 *et seq.*
[7] 1 Am Jur, Adverse Possession §§ 141, 146.
    Use of property by public as affecting acquisition of title by adverse possession. 2 ALR 1368.
[8] 1 Am Jur, Adverse Possession § 245.
[9] 1 Am Jur, Adverse Possession § 246.
[10] 18 Am Jur, Ejectment §§ 105, 115.

3. APPEAL AND ERROR—EJECTMENT—NONJURY CASE—PREPONDERANCE OF EVIDENCE.

The Supreme Court affirms the finding of the trial court in a nonjury action of ejectment unless the finding is against the clear preponderance of the evidence.

4. EJECTMENT—EVIDENCE—ADVERSE POSSESSION.

Evidence presented by defendants in nonjury action of ejectment *held*, ample to support finding of trial court that defendants' possession was neither adverse, entire nor continuous, hence, insufficient to sustain their claim of title by adverse possession.

5. ADVERSE POSSESSION—PERMISSIVE POSSESSION.

Permissive possession is not adverse and cannot ripen into title by adverse possession.

6. SAME—ELEMENTS.

The possession necessary to establish title by adverse possession must be actual, visible, open, notorious, exclusive, continuous, uninterrupted for the statutory period, hostile and under cover of claim of right (CL 1948, § 609.1).

7. SAME—COMMON OCCUPATION WITH PUBLIC—EXCLUSIVENESS.

Neither occupation in common with the public nor possession concurrent with that of the true owner is ever exclusive, hence, is not adverse possession.

8. SAME—EVIDENCE—TAX RECEIPTS.

Tax receipts of defendants' predecessor in title were not sufficient to establish title to disputed tract by adverse possession, where record presented does not afford a means of identifying the lands covered by the tax receipts with the disputed tract.

9. SAME—POSSESSION UNDER CLAIM OF RIGHT—EVIDENCE.

Defendants who claim title to disputed tract of land by adverse possession *held*, not to have shown that their predecessor ever entered into possession under any contract of purchase.

10. EJECTMENT—RECORD TITLE—ADVERSE POSSESSION—EVIDENCE.

Record title as proven by ejectment plaintiff *held*, prima facie sufficient to entitle him to judgment, where defendants in their statement of grounds for appeal failed to point out any specific flaw in the record title as offered by plaintiff and failed to sustain their burden of proof as to adverse possession.

CARR, SHARPE, and DETHMERS, JJ., dissenting.

Appeal from Muskegon; Sanford (Joseph F.), J. Submitted October 14, 1953. (Docket No. 65, Cal-

endar No. 45,889.)   Decided February 18, 1954.   Rehearing denied April 15, 1954.

Action in ejectment by Baker A. Hamilton against Christian and Lena Weber.   Judgment for plaintiff. Defendants appeal.   Affirmed.

*R. Burr Cochran,* for plaintiff.

*Alexis J. Rogoski* and *Robert Bunker Rogoski,* for defendants.

SHARPE, J. (*dissenting*).   This is an action in ejectment brought by plaintiff against defendants to recover possession of land, to which plaintiff claims title in fee simple and to which defendants claim title by adverse possession by themselves and of their predecessors in title.   Plaintiff purchased the property in dispute from Elizabeth Row, the record title holder, under date of October 15, 1923.

Defendants claim title to the lands in question by virtue of the claims set up in their answer to plaintiff's declaration:

"7. Further answering said declaration, defendants say that prior to the month of December, 1879, Christopher Weber, was let into possession of the land described in plaintiff's declaration by Simon J. Murphy and Joseph Heald, the owners thereof, pursuant to a contract or agreement between said Simon J. Murphy and Joseph Heald to sell said land to the said Christopher Weber, together with other land owned by them situate in lot 3 of section 2, town 11 north, range 18 west, Muskegon county, Michigan; that on, to-wit, the 21st day of February, 1882, the said Simon J. Murphy and his wife, and said Joseph Heald and his wife, executed, acknowledged and delivered to said Christopher Weber a warranty deed purporting to convey to him the land described in

plaintiff's declaration together with other land adjoining the same; that afterwards and on, to-wit, the 15th day of July, 1882, said deed was duly recorded in the office of the register of deeds for the county of Muskegon in liber 49 of deeds on page 29; that if the description contained in said deed failed to embrace the land described in plaintiff's declaration, or any part thereof, the omission thereof was due to mistake, inadvertence or oversight on the part of the said Simon J. Murphy and Joseph Heald; for Christopher Weber had actually entered into possession of the land described in plaintiff's declaration as well as the land described in said deed under a claim of title to all of said land; that a portion of the land described in plaintiff's declaration is situate on a bluff or hill; that immediately after entering into possession of the land described in plaintiff's declaration, said Christopher Weber cleared the portion thereof located on the crest of said bluff or hill, and continuously thereafter used and occupied said portion of said land; that he erected benches on said premises and otherwise from time to time improved the same; that he constructed a stairway leading from the crest of said hill to the bottom of said slope as a means of access to the channel of water known as the 'Old Channel' on the westerly boundary of said land; that he constructed fences on the portion of said land at the foot of the hill and continuously used all of said portion of said land as a pasture; that after said Christopher Weber entered into possession of said land, he paid taxes on all of said lot 3 except the part thereof known as the Foley lot and the Powers lot; that prior to the 23d day of March, 1925, the said Christopher Weber executed, acknowledged and delivered to defendants a warranty deed, bearing that date which he represented to defendants covered the land described in plaintiff's declaration together with adjoining land; that afterwards and on, to-wit, the 1st day of April, 1925, said last-mentioned deed was recorded in the office of the register of deeds for the county of Muskegon in

liber 253 of deeds on page 221; that defendants took and continued in possession of the land described in plaintiff's declaration; that they have been in continuous possession thereof ever since they entered into possession thereof, and have used every part and parcel thereof in conjunction with a summer resort hotel owned and operated by them; that the said Christopher Weber was in open, notorious, hostile, exclusive, peaceful, actual, continuous and absolute possession of the land described in plaintiff's declaration, claiming to be the owner thereof in fee for a period in excess of 15 years, that is to say, from, to-wit, the year 1879, until, to-wit, the year 1925; that the possession of said Christopher Weber was hostile to the entire world, and that by reason thereof, he acquired title to the land described in plaintiff's declaration long prior to the 23d day of March, 1925, and in to-wit, the month of December, 1894; and that said Christopher Weber was the owner of said land in fee to the date he sold the same to defendants and let them into possession thereof."

and by virtue of a deed from Christopher Weber, Sr., under date of March 23, 1925, of land adjoining the lands in question. Plaintiff also relies upon a statement in writing purporting to have been signed by Christopher Weber, Sr.

"White River, Mich.
September 15, 1923.

"I, Christopher Weber, of said township, do hereby certify the truth to be that I am the owner of 8 and 82/100 acres of land in said township as a homestead, described in No 46 of abstract.

"That I am not the owner of any other land in said township or make no claim to same or never have.

(signed) CHRISTIAN WEBER
"Witnessed by
"W. E. OSMUN & Dr. B. A. HAMILTON."

On February 21, 1882, Christopher Weber, Sr., received a deed covering a tract of land upon which is a large, 2-story, L-shaped frame building, having a long front porch facing on a roadway. This roadway extends from a public highway adjoining the northerly boundary line of the land Christopher Weber, Sr., purchased on a land contract in 1878. Shortly after Christopher Weber, Sr., went into possession of the property he purchased, he converted the dwelling into a summer resort hotel, and since the premises has been known as "Pine Bluff Resort." The premises between the roadway and the old channel has been known as "Weber's Hill." Christopher Weber, Sr., exerted some dominion over the premises from 1888, or earlier, until March 23, 1925, when he executed a warranty deed to defendants. The description in the deed does not describe or embrace the land in controversy. Defendants have exercised the same or similar dominion over the premises as did Christopher Weber, Sr., until the present suit was instituted in 1938. After Christopher Weber, Sr., deeded the premises to defendants, he continued to make his home with them until his death in 1936, at which time he was 90 years old. It also appears that although plaintiff had obtained quitclaim deeds to the premises in 1919 and 1923, he never asserted title to the property during the life of Christopher Weber, Sr.

When the cause came on for trial, plaintiff introduced evidence to the effect that he purchased the disputed property in 1923 from the record title holder; that plaintiff planted pine trees and stored timber on the land; that defendants obtained permission from plaintiff to cut dead trees and build a bridge; that defendants had knowledge that plaintiff sold 4 lots to 3 different people; that Christopher Weber, Sr., dealt with the disputed land in a manner

inconsistent with any claim of ownership, in that he created a tenancy by the entireties in 1908, describing only the premises in his original deed; by signing a disclaimer in 1923; by deeding the original property in 1925 to defendants; by removing a fence at the request of Mrs. Dowling; and by renting from plaintiff for pasturage purposes.

At the close of plaintiff's proofs defendants made a motion to dismiss plaintiff's suit, for the following reasons:

"1. That the statement of title annexed to plaintiff's declaration or plaintiff's proofs fails to establish any paper or record title in the plaintiff.

"2. Plaintiff's proofs fail to specifically identify the property which is the subject matter of this suit.

"3. It fairly definitely appears from the proofs that the defendants have a better possessory title than plaintiff.

"4. Plaintiff's proofs fail to establish any better title to the land in controversy than defendant's titles.

"5. It affirmatively appears from the proofs that a number of the parcels of land sought to be recovered by plaintiff are subject to easement and actions in easement may not be recovered in an action in ejectment.

"And, finally, there is fatal variance between plaintiff's declaration and the proofs."

The motion was taken under advisement.* Defendants thereupon produced a number of witnesses to show that prior to the time plaintiff obtained his quitclaim deeds, Christopher Weber, Sr., had acquired title to the premises by adverse possession.

George J. Burke, a witness produced by defendants, testified:

---

* See CL 1948, § 691.691 *et seq.* (Stat Ann and Stat Ann 1953 Cum Supp § 27.1461 *et seq.*).—REPORTER.

"I am a resident of Ann Arbor, Michigan. I have been engaged in the practice of law there for 32 years. I am attorney for the University of Michigan.

"We first came to the White Lake resort region in 1920 or 1921.

"The property between the road and the old channel was used as a part of the facilities, what I considered to be the Weber interests or Pine Bluff. I don't recall having seen the elder Weber work on the grass, the lawn on the top of the hill, but I have seen the younger Weber working there, on the land between the road and the old channel. I don't recall especially about chairs being placed there, but it was my impression there were some built seats around or between the trees. I know I have gone out there myself to watch people pitch horseshoes, and after a meal. The only means of access to the Weber curtilage is by means of the road which runs from the main road from Whitehall down to the old channel."

William Mlodock, a witness produced by defendants, testified:

"I am familiar with the White Lake region in Michigan. My first appearance there was in 1907. I have been there approximately every year since that date, sometimes as much as 6 to 8 months a year. I have 1 daughter. I am 54 years of age.
\* \* \*

"The Weber property then was, in the main, substantially like it is now. The Foley's and Powers' houses were not there in 1907. There were steps that came down the hill on the property to the west of the Weber house. The picture, exhibit 5A, shows the staircase to which I refer. On it is my wife, a friend, and myself. The stairway as shown in that picture is the way it appeared in 1907. That stairway was there several years after that date. The stairway was used for the convenience of the resorters in making their boats accessible, which were moored at the base of the hill. In those early days

there would be between 20 and 40 resorters at Weber's place. * * *

"In 1907 and in each year that followed when I was there at the Weber resort, I observed cattle grazing on the grass at the foot of the hillside west of the Weber house—between the hill and the channel. They were Mr. Weber's cattle. He generally had 2, but sometimes 3. I can recall that at that time they were both tied up and at other times one would be tied and the other roamed around. * * *

"In 1907 and in each year that has passed since that time, up until Mr. Weber, Sr's., death, the land to the west of the roadway that runs in front of the Weber house was used for pasture purposes as well as general recreational facilities for the resorters. In the early years before the advent of the automobile, the space on the top of the hill was used for playing ball and for a roving place for the children. They had a swing there, and I know that I sat in the swing with my daughter. At the beginning of my experience there they did pitch horseshoes in the road, but about 10 years later a court was developed almost directly east of the present court. The present court shows in the panoramic picture, which is plaintiff's exhibit 1. The other court was almost in line with the present court but was directly south of it. The old depression where one of the stakes was is still there in the sod. * * *

"I wouldn't say that I was on this property every year since 1907 for there may have been 1 or 2 years that I skipped the entire year in the early period, but I would say subsequent to 1919 I was up there every year. Between 1907 and 1922 I was there approximately every year, though I might have missed 1 or 2 years. The younger Webers have used and utilized the property in the same manner and for the same purposes as their uncle. * * * In my chats with him on the porch our conversation led around to the scope of his property and he told me that he owned the land from his east line down to the channel within the north and south fence of his

farm land. He told me that on more than one occasion. He said he had paid the taxes on it for a good many years. * * *

"I never knew of Dr. Hamilton questioning Weber's title to the property. There was a sign advertising the resort posted in place on the property west of the road that runs in front of the Weber house. In the early days the Goodrich Boat Line in its circulars advertised the Weber Resort, the Pine Bluff Resort, as being located on the old channel. In fact, all my communication with Weber read 'Pine Bluff Resort on the Old Channel.' In 1907 the place was just as beautiful as it is today. I never knew of anyone other than Weber claiming the property that is the subject of the litigation in this case. I have never known of anyone working it or manifesting any indication of ownership over this land other than Mr. Weber, Sr., and Mr. Weber, Jr."

Marie Goennal, a witness produced by defendants, testified:

"I live in Chicago, Illinois. I am 61 years of age, I am acquainted with the Weber property in White River township. I have been there at different times visiting but I don't know anything about the property except that Mr. Weber always told us that his property ran way down to the channel. The first time I went over there with my 2 children was in 1908. * * *

"My children played on the lawn on the crest of the hill, sat on the swings and the benches, and ran down the hill. The swings and benches were kept there for the Weber guests. He told me, 'This is our bench and that is our swing,' and he says 'Any time you put the children on the swing, all right.' He always kept the grass on the top of the hill so it looked nice. I have seen him cutting it. I think the stairway was there when I was there. The impression left by the stairway is still there."

William Murray, a witness produced by defendants, testified:

"I live in Fruitland township. I am 69 years old. I am proprietor of the hotel known as Murray's Inn. It is located on Sylvan Beach, right at the entrance to the channel, on the north side. I am acquainted with the Weber property. * * *

"I observe the stairway on the picture, leading down the hill. Chris Weber, Sr., built that stairway. I don't remember whether that stairway was there some time prior to the time I tore down the cottages. Mr. Weber had cows which he pastured on the low land below the hill. He had them on leashes, put a post down and then fastened the cow around the post. I think he built that stairway when he commenced to take boarders. According to my best recollection it remained there about 35 years. It remained there until it finally rotted away. After '93 I didn't go down the road there. Prior to the year '91 it seems to me that the Weber cows were always pastured there—since the beginning of my memory."

Albert Anderson, a witness produced by defendants, testified:

"Chris Weber, Sr., kept the lawn cut at the top of the hill and west of the highway there. I have seen him cutting the weeds down and I have seen him with a scythe cutting the weeds down below the hill and on the side of the hill which he also kept clean. He kept it in that condition year after year. I never had any talk with him as to the extent of his ownership of land there or never heard him say anything about it. The lawn part that he kept cleared on the side of the hill was kept that way because it was used as a yardway in connection with his resort business. People that came to the resort would go about that part of the premises. Temporary benches were also kept out there at different times. * *. *

"During all the time that I have been familiar with that property I have not known of anybody claiming

it or exercising any dominion or ownership respecting it other than the Webers, except that we heard rumors years ago and then I never heard any more about it."

Charles Ohrenberger, a witness produced by defendants, testified:

"My folks lived in the neighborhood of the Webers and I got acquainted with them in that way. I have known him for 30 years anyway. He never told me what land he owned there. I am familiar with and have seen him use the roadway in front of the house. I have seen him using the land to the west of the road, between the roadway and the front of the house and between the old channel. He used to have a swing there and tables and chairs. He kept resorters there. The tables and chairs and swings were placed there for the resorters who frequented his place. (The witness indicated on the picture, plaintiff's exhibit 1, the space to the west of the roadway to which by his testimony he referred.) (The witness indicating.) That is where the table and chairs were placed. That was true of every season."

Mary I. Bush, a witness produced by defendants, testified:

"I have been acquainted with the Weber property since 1890, and I was acquainted with Christian Weber, Sr., in his lifetime, ever since 1890. The Webers, the defendants, conduct a variety of a 'boarding-house hotel' on this property, and it was conducted by Chris Weber, Sr., in his lifetime.

"I am familiar with the road which runs in front of the hotel property. The property immediately west of the road is the crest of a hill. It is a lawn. I have seen Mr. Chris Weber, Sr., improve that part of the property. He cut the grass and kept it mowed. I remember him having little seats between the trees on that part of the property. That dates back as long as I can remember."

Fred Aley, a witness produced by defendants, testified:

"Mr. Weber used to have some woodsheds on the side of the hill and he would let his wagon stand over in there most of the time across from that barn. His winter wood was piled across the road from the house on the west side of the road. He had a year's supply of wood corded up. He always staked his cows on the land below the hill. I remember the old set of steps that went up the hill. * * * In those early days, and prior to 1892, the land to the west of the road that ran in front of the house was utilized by Weber for his boarders. They used to sit out there. They had swings if I recollect right and benches. We always called that land 'Weber Hill.' "

Alice Standley, a witness produced by defendants, testified:

"I understand that the disputed tract is the tract between the front porch of the house and the old channel. I do not recall any other particular uses which Mr. Christian Weber, Sr., made of that disputed tract other than pasturing and for the use of his guests. The horseshoe games were always pitched there. That has been true as long as I can remember. After the automobile became popular, and in general use, this territory on the crest of the hill to the west of the highway was always used for a parking place for the automobiles of guests of the hotel."

Benjamin Aley, a witness produced by defendants, testified:

"I have been a resident of Muskegon county for 62 years, was born and raised in White River, and have played in the vicinity of White Lake and along the old channel trail ever since I was a boy. I knew Chris Weber, Sr., in his lifetime. He was occupying

the Weber house where the young Chris lives at the time I first knew him. I can remember the old mill. I can remember Chris Weber, Sr., and his wife when they lived in the old house. Back in my boyhood that property was known as Chris Weber's Hill, and Chris Weber's. We used to sit and swing and play croquet on the land west of the house and down to the old channel and all of it was known as Weber's property. I remember when Weber had boarders there, back in the nineties, and parties coming there by rowboat, up the channel. They had little slips down in the edging docks to land their boats and they put them right in there, and kept them there during the period of their stay. Chris Weber also kept his there. Chris Weber's cattle were staked out there down below. I don't know of farmers or neighbors other than Weber using that same land for pasturage purposes. I remember the berry patches that were on the property. They were back of the barn.   *   *   *

"Across the road from the old barn he used to put his woods, his wagons, his sleighs, buggies, tools, and so on. The part of the land I refer to was adjacent to the roadbed and to the west of the road. There were some horseshoe courts there and we played croquet. I remember the steps that went down the hill. Exhibit 2 which you show me represents it as it was then. All of the hillside that is on the left of the picture, defendants' exhibit 2, was used for grazing by Weber's stock, and was used by the resorters and boarders."

In addition to the above evidence there is evidence that Christopher Weber, Sr., paid taxes on the lands from 1899 to 1923; that on May 3, 1921, Christopher Weber, Sr., signed a petition addressed to the board of county road commissioners to lay out a highway adjoining his property, in which he described himself as the owner of the land in controversy; that on May 18, 1922, he executed a right-of-way release covering a part of the land in controversy; and that

the sign advertising the Weber place as the "Pine Bluff Resort" has always stood on the land in controversy.

The trial in this case commenced May 23, 1939, and was concluded July 8, 1940. On February 17, 1941, the trial judge filed an opinion in which he held that plaintiff was entitled to recover the lands in controversy. In an opinion, the trial court stated:

"I must conclude, from the evidence produced at the trial of this cause, that there was no outstanding title to the land in dispute in Christian Weber, Sr., and that defendants were never let into possession thereof; also, that Christian Weber, Sr., never claimed title to the land in dispute by conveyance or adverse possession. While the disclaimer signed by defendants' grantor has not the force of a deed, it is, nevertheless, significant in that it evidences the fact that he made no claim to the land now in dispute. The evidence convinces me that the disclaimer was signed by defendants' grantor while he was mentally competent and was not induced by fraud or duress.

"The proof relied upon by defendants to establish adverse possession is weak and without convincing force. * * * The evidence falls far short of establishing adverse possession, either on the part of defendants' grantor, or defendants; and inasmuch as the evidence establishes the plaintiff's title in fee simple to the land, it must be held that plaintiff is entitled to a judgment for possession of the premises in question."

Defendants filed a motion for a new trial, alleging that the judgment against defendants is against the clear weight of the evidence. On August 11, 1952, a visiting judge denied the motion for a new trial. Defendants appeal and urge the same reasons for reversal as were stated in their motion for a new trial.

In ejectment cases plaintiff must rely upon the strength of his own title and not on the weakness of defendants' title. See *Doelle* v. *Read,* 329 Mich 655. The burden of proof rests upon plaintiff to show that he has a valid title to the premises in question. It is defendants' claim that prior to the time plaintiff secured his quitclaim deeds to the property, Christopher Weber, Sr., had acquired title to the property by adverse possession. There is proof in the record that as early as 1888 Christopher Weber, Sr., exercised some control over the premises by making some permanent improvements thereon. He erected a stairway, constructed a bench between trees, constructed a swing, paid taxes on the land in question, and had the taxes assessed to him.

In *Gardner* v. *Gardner,* 257 Mich 172, 176, we quoted with approval from *Holtzman* v. *Douglas,* 168 US 278 (18 S Ct 65, 42 L ed 466):

" 'Payment of the taxes, as described in the above statement of facts (1868–1893), is very important and strong evidence of a claim of title; and the failure of the plaintiffs' predecessors to make any claim to the lot or to pay the taxes themselves, is some evidence of an abandonment of any right in or claim to the property. In *Ewing* v. *Burnet,* 11 Pet (36 US) 41 (9 L ed 624), it was held by this court that the payment of taxes on land for 24 successive years by the party in possession was powerful evidence of the claim of right to the whole lot upon which the taxes were paid. The same principle is held in *Fletcher* v. *Fuller,* 120 US 534, 552 (7 S Ct 667, 30 L ed 759). It is some evidence that the possession was under a claim of right and was adverse.' "

It also appears that Christopher Weber, Sr., made available to his guests the crest of the hill. He used the property between the road and the old channel as a part of his facilities for his summer resort hotel. He pastured cattle on the premises. He stored his

year's supply of wood, wagon, tools and equipment on part of the premises. In *Murray* v. *Hudson,* 65 Mich 670, 673, 674, we said:

"To constitute possession it is not necessary that the land should be enclosed with a fence, or that the same should be cultivated or resided upon, or that buildings should be erected thereon. It is sufficient if the acts of ownership are of such a character as to openly and publicly indicate an assumed control or use such as are consistent with the character of the premises in question.   *   *   *
"It is not necessary that the occupation should be such that a mere stranger passing by the land would know that someone was asserting title to and dominion over it. It is not necessary that the land be cleared or fenced, or any building be placed upon it. *Ellicott* v. *Pearl,* 10 Pet (35 US) 412 (9 L ed 475); *Ewing* v. *Burnet,* 11 Pet (36 US) 41 (9 L ed 624); *Langworthy* v. *Myers,* 4 Iowa 18; *Booth* v. *Small,* 25 Iowa 177; *Brooks* v. *Bruyn,* 24 Ill 372, 380."

See, also, *Pulcifer* v. *Bishop,* 246 Mich 579, and *Monroe* v. *Rawlings,* 331 Mich 49.

In our opinion Christopher Weber, Sr's., acts of ownership over the premises in question were of such a character as to establish title in him by adverse possession. These acts of ownership continued from 1888 to at least 1923, a period much greater than the time required for adverse possession to ripen into title.

Plaintiff also urges that if Christopher Weber, Sr., had gained any rights by adverse possession, he lost them through the disclaimer executed September 15, 1923. For the purpose of this opinion we shall assume that Christopher Weber, Sr., executed the disclaimer as contended by plaintiff. The so-called disclaimer was not a deed nor intended to convey any real estate. At most, it was Christopher Weber, Sr's., opinion in 1923, but at the date of its execution title

to the disputed area was already in Christopher Weber, Sr., and he could not pass title by a disclaimer.

We are constrained to hold that at the time plaintiff instituted the present action he was not the owner. The trial court was in error in entering judgment in favor of plaintiff. It follows that the judgment should be reversed, and a judgment should be entered in favor of defendants, with costs.

CARR and DETHMERS, JJ., concurred with SHARPE, J.

REID, J. I am not in accord with the opinion of Mr. Justice SHARPE.

Four matters admitted by defendant Christian Weber (spoken of as Weber, Jr.) in his testimony contradict the defendants' claim of adverse possession.

First, sales by plaintiff without protest by defendants of lots, being part of the tract claimed by defendants, but the defendants knew of the sales and do not claim the sales were irregular nor claim ownership of the lots.

Second, plaintiff planted a row of pine trees on the lands in question with defendants' knowledge and without protest by defendants.

Third, plaintiff often walked over and was present on the lands in question without protest by defendants nor by defendants' grantor, Weber, Sr.

Fourth, defendants have not paid any taxes on the tract in question.

Heavy timbers were left for some years by plaintiff on the lands in question without protest by defendants who knew of the fact.

There is testimony by plaintiff's witnesses, Mrs. Brand, Murray Jackson, Emma Lorenz, and by plaintiff, that during the claimed possession by both Weber, Sr., and defendants, the general public made

use of the premises in question under circumstances indicative of knowledge on the part of Weber, Sr., and of defendants, without protest by either. Further, defendants' deed from Weber, Sr., did not cover the lands in question and although Weber, Sr., lived for over 10 years after deeding to defendants, no correction in the description of the lands involved was ever made, nor additional deed given.

Another undisputed matter is that in 1924 one lot, a part of the tract in question, was sold by plaintiff, Baker Hamilton, before Weber, Sr., deeded the 8-acre tract to defendants.

Mrs. Brand testified:

"My father bought the property where we live from Dr. Hamilton in 1924 and we bought it from my father in 1931."

She further testified:

"*Q.* Now, at the time that you were with your father and your father was thinking of buying along there, I will ask you whether or not that matter was talked over and the elder Mr. Weber was present?

"*A.* It was talked over with the other Mr. Weber. We didn't discuss it with him but he heard the conversations."

She further testified:

"The property west of the so-called Weber place, between that and the old channel, has never been fenced to my knowledge. Everybody used the property west of the Weber property who cared to. It was more or less open to the public. Cattle roamed in there if they had pulled their stakes."

Mrs. Hamilton, wife of plaintiff, testified:

"*Q.* Well, what was the conversation as near as you can give it, Mrs. Hamilton?

"*A.* Well, the part that I remember was that it would be useful for him [plaintiff] to be able to use

a couple of old runners, long timbers, that he thought would span the water nicely and that it would help him to build a bridge reasonably.

"*Q*. Well, as to whether or not he asked the Doctor for permission to do it?

"*A*. Yes, sir."

The original use of the lands in question by Weber, Sr., was obtained by permission from the then owner of the record title, Mrs. Dowling.

John Bruce, son-in-law of Weber, Sr., has been familiarly acquainted with the lands in question for over 35 years before the trial. He testified:

"The picture, exhibit 1, shows 3 houses. They stood at the bottom of the hill and there on the picture are the steps Weber built down there. Mrs. Dowling gave them permission to build them."

Mr. Bruce also testified:

"As to the land that lies between the Weber house and the old channel, the only time Weber used it was to put a patch of strawberries down there south of the barn and he had it fenced and Mr. Dowling came up there and said, 'Mr. Weber you got that fenced in and I want you to take that fence off,' and he took it off the next day. That is the only fence I seen around there. Cattle grazed all over the property. Everything was there years ago, loose."

Plaintiff testified:

"We had arrangements with the older Weber whereby they gave us the fertilizer for the pasture and cut the weeds and when the older gentleman passed out of the picture, junior Mr. Weber, not having any fertilizer to give us, we took some of his barn timbers to pay the cows' pasture. His old barn he wrecked and built a new one and had the old timbers that we needed and we made a bargain to that effect."

He also testified:

"*Q.* Now, you referred to some lots that you sold. I will ask you whether or not those lots are to the south of the south line marked in plaintiff's exhibit 4 as shown in the marker?

"*A.* There are 4 lots sold south of the south line.

"*Q.* Those lots are owned by whom?

"*A.* By a Mr. Fritsch, a Mr. Barret and Mr. Brand.

"*Q.* How long have these people owned these lots?

"*A.* 1924, '26 and the last one '31.

"*Q.* Has the younger Chris Weber ever at any time made any objections to you or indicated in any way that you had not a perfect right to sell those lots?

"*A.* He never did.

"*Q.* During all of that time the younger Weber had been in there, since 1924, has he ever at any time said anything to you which would indicate that he claimed that he owned this property?

"*A.* Not at all until the last 2 years."

Defendant Weber, Jr., testified:

"Dr. Hamilton planted those pine trees along the side of the ice house, some time in 1925. I saw him plant them. I did not say anything to him. * * * I didn't say anything to Dr. Hamilton when he planted those pine trees that are along side of the ice house."

Defendant further testified:

"I never talked to him [plaintiff] about coming on the land there. I remember that a few years ago Dr. Hamilton had some timbers put down on the channel. I saw the timbers there. The timbers are shown on the exhibit. They are still in the same place. They have been there for 2 or 3 years. He got those timbers at the government pier, and he had Mr. Ed Meinert haul them down there. I said nothing to him."

When Weber, Jr., and wife, defendants, mortgaged the property that was deeded to them by Weber, Sr.,

they did not include the property in question in the mortgage. Defendant Weber, Jr., further testified:

"*Q*. You never told Doctor Hamilton that you owned that property out in front, did you?

"*A*. I said nothing to Doctor Hamilton."

Weber, Jr., has never paid any taxes on the disputed property. He testified:

"Any taxes I have paid on the property since I have had a deed have been paid on the same description as I paid on in 1924. All my tax receipts have the same description. I haven't paid taxes on any property running down to the old channel since I got the place."

Plaintiff testified that he paid the taxes on the disputed tract ever since the deed from Elizabeth Row to him, October 15, 1923.

A disclaimer dated September 25, 1923, purporting to be signed by Weber, Sr., was offered and received in the trial court, but it is claimed by the defendants that the court was in error in receiving the exhibit. The signatures of the 2 witnesses to the disclaimer were proven, and also, that the body of the disclaimer was in the handwriting of Osmun, one of the two witnesses. The signature of Weber, Sr., on 2 checks was then proven as being genuine. Following this the court admitted the disclaimer in evidence, but with the reservation that he would consider the matter further. Defendants did not in their reasons and grounds for appeal set forth any claimed error in the admission of the disclaimer, though the court in his opinion had treated the disclaimer as being in evidence. Defendants may not now in view of Court Rule No 66, § 3 (1945), rely on this claimed error for reversal. The disclaimer is a cogent reason for considering the possession by Weber, Sr., of the premises in dispute as permissive rather than adverse. Even without the disclaimer, the conclusion is inevi-

table that possession by defendants and by their grantor, Weber, Sr., was not adverse but permissive and also not entire nor continuous.

Even if all the facts testified to by defendants' witnesses indicative of possession were found to be true, still there remain facts admitted by defendant Christian Weber himself which showed the lack of continuity of the possession and that defendants' possession was permissive. It further appears that during the lifetime of Weber, Sr., and until 2 years before the trial, the lands in question were open to the public and that the owner of the record title to the lands in question simply did not take the pains to order people off the premises. The consequence was that Weber, Sr., and afterward, Weber, Jr., whose boarding house was near by, made very much more use of the premises for the accommodation of their boarders than any other one member of the general public, but the use by Weber, Sr., and afterward by Weber, Jr., was by permission. The case being in ejectment and having been tried by the court without a jury, we affirm the finding of the court unless the same is clearly against the preponderance of the evidence. In this case there is ample support for the finding by the trial court over and above the admissions by the defendant Weber, Jr., himself in his testimony.

Permissive possession is not adverse and cannot ripen into title by adverse possession. See *Warner v. Noble,* 286 Mich 654; *Carr v. Bartell,* 305 Mich 317; *Taylor v. S. S. Kresge Company,* 326 Mich 580.

"The possession necessary to establish title by adverse possession must be actual, visible, open, notorious, exclusive, continuous, uninterrupted for the statutory period, hostile, and under cover of claim of right." *Yatczak v. Cloon,* 313 Mich 584, 589, 590.

"Neither occupation in common with the public nor possession concurrent with that of the true owner

is ever exclusive." *LeRoy* v. *Collins,* 176 Mich 465, syllabus 3.

For the Michigan statute as to adverse possession, see CL 1948, § 609.1 (Stat Ann § 27.593).

Defendants claim that their grantor, Weber, Sr., paid the taxes for several years on the property in dispute, but do not count on this ground specifically in their statement of grounds for appeal. Plaintiff claims that the descriptions in the tax receipts relied on by defendants as showing taxes paid by Weber, Sr., are vague and the property not identifiable. The record does not afford a means of identifying the lands covered by the tax receipts of Weber, Sr., with the lands in dispute. Further, as we have already seen, the possession by Weber, Sr., as well as the possession by defendants, was permissive and not continuous.

The defense fails of proof that Weber, Sr., ever entered into possession of the disputed lands under any contract to purchase the same.

Defendants in their statement of grounds for appeal did not point out any specific flaw in the record title as offered by plaintiff. An examination of the record indicates that the record title as proven by plaintiff is prima facie sufficient to entitle plaintiff to judgment. The defendants' claim of adverse possession is clearly faulty and this defense must fail.

The evidence does not clearly preponderate against the finding of the trial court and that finding is affirmed. The judgment from which the appeal was taken was for plaintiff for ejectment subject to a defined private roadway. That judgment is affirmed. Costs to plaintiff.

Butzel, C. J., and Bushnell, and Boyles, JJ., concurred with Reid, J.

Kelly, J., took no part in the decision of this case.